**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | **No. 21-cv-3450** |
| **GREGORY DAVID PARIS and BARRINGTON ASSET MANAGEMENT, INC.** | ) ) ) | **JURY DEMANDED** |
| **Defendants.** | ) ) ) | |
| _____ | ) | |

**COMPLAINT**

Plaintiff United States Securities and Exchange Commission ("SEC")

alleges:

1.    This case involves a fraudulent cherry-picking scheme carried out

by Defendants Gregory David Paris ("Paris") and Barrington Asset

Management, Inc. ("BAM") (together, Paris and BAM are the "Defendants").

BAM is an investment adviser registered in Illinois and Georgia. Paris is

BAM's vice-president and chief compliance officer. From at least December

2015 through October 2019 ("Relevant Period"), Paris secretly enriched himself

at the expense of Defendants' clients. All told, Paris received more than

$630,000 in ill-gotten gains from his deceptive scheme.

2.    "Cherry-picking" is when an investment adviser defrauds his clients by purchasing stock and then waiting to see whether the price of the stock goes up, or down, before allocating the trade. If the stock goes up, he keeps the trade for himself. If the stock goes down, he puts the trades into client accounts. He "cherry-picks" the profitable trades for himself and gives the unprofitable ones to his clients. Oftentimes Paris closed out a profitable position before he allocated the trade for himself – giving himself locked-in, guaranteed profits.

3.    Through this cherry-picking scheme, Paris misappropriated profits that should have gone to Defendants' clients, and avoided losses that Paris should have borne himself.

4.    Defendants also misrepresented how they were trading securities for their clients. In documents BAM sent to its clients, which Paris reviewed and approved, Defendants represented that the trades made on the clients' behalf were being fairly allocated among the client accounts. The firm also represented that "no person employed by the firm shall prefer his or her own interest to that of an advisory client" and that the firm reviewed employees' personal trading activity. These claims were false, as Paris was cherry-picking trades, and no one was reviewing his personal trading activity.

5.    Through this misconduct, Defendants violated various antifraud statues and Commission rules, including Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act"); Section 10(b) of the Securities

Exchange Act ("Exchange Act") and Ruled 10b-5(a), 10b-5(b) and 10b-5(c) thereunder; and Sections 206(1) and 206(2) of the Investment Advisers Act ("Advisers Act").

6.      Based on these violations, in this lawsuit the Commission seeks: (a) entry of a permanent injunction prohibiting Paris and BAM from further violations of the relevant provisions of the federal securities laws; (b) disgorgement of ill-gotten gains for the period covered by the applicable statute of limitations, plus pre-judgement interest; and (c) the imposition of civil monetary penalties.

## JURISDICTION AND VENUE

7.      The SEC brings this action under Section 20(b) of the Securities Act [15 U.S.C. §77t(b)]; Sections 21(d) and 21(e) of the Exchange Act of 1934 [15 U.S.C. §§78u(d) and 78u(e)]; and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

8.      This Court has jurisdiction over this action under Section 22 of the Securities Act [15 U.S.C. § 77v]; Section 27 of the Exchange Act [15 U.S.C. § 78aa]; Section 214 of the Advisers Act [15 U.S.C. § 80b-14]; and 28 U.S.C. § 1331.

9.      Venue is proper in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Northern District of Illinois and elsewhere.

10.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged below, and will continue to do so unless enjoined.

## DEFENDANTS

11.     **Defendant Gregory David Paris**, age 51, is a resident of Barrington, Illinois. He serves as the chief operations officer, vice-president and chief compliance officer of BAM. Paris is a certified public accountant and an attorney authorized to practice law in Illinois. He has worked in the securities industry for more than 20 years, and holds several licenses conferred by the Financial Industry Regulatory Authority.

12.     **Defendant Barrington Asset Management, Inc.** is an Illinois corporation headquartered in Chicago, Illinois. BAM is registered as an investment adviser in Illinois and Georgia. Until 2012, it was registered as an investment adviser with the SEC. Paris owns 15% of BAM and, together with his brother, oversees its day-to-day operations.

## OTHER RELEVANT PARTIES

13.     **Barrington Research Associates, Inc. ("BRAI")** is an Illinois corporation headquartered in Chicago, Illinois. BRAI has been registered with the SEC as a broker-dealer since 1983. BRAI serves mainly institutional customers, providing research on small cap companies and trade execution services. Paris owns 28% of BRAI's equity. BRAI executes all trades for BAM

accounts.

**FACTS**

14.     BAM is the investment adviser for about 45 individual advisory clients, all on a discretionary basis. BAM is also the investment adviser to the Barrington Opportunity Fund ("BOF"), a private fund that invests in equities. During the Relevant Period, the BOF had seven limited partners with about $2.4 million in assets.

15.     Paris made investment decisions for about ten of BAM's individual advisory clients and the BOF (collectively, the "BAM Clients").

16.     Paris made trades for his personal account and BAM Clients' accounts using an "omnibus account." He later distributed those trades to a selected client account or to himself.

17.     An investment adviser sometimes uses an omnibus account when making a large purchase of stock for several different clients at the same time. In general, an omnibus trading account allows an investment adviser to buy and sell securities on behalf of multiple clients simultaneously, without identifying to the broker the specific accounts for which a trade is intended in advance.

18.     For example, if an adviser separately purchases the same security for several clients on the same day, the adviser might obtain different prices on each transaction because of normal market fluctuation. Rather than placing individual orders in each client account, the adviser can place an aggregated order, or "block trade," in the omnibus account and later allocate the trade

among multiple accounts using an average price.

19.    When used properly, an adviser will fairly allocate the block trade from the omnibus account among client accounts, ensuring that no account receives preferential treatment over another.

20.    When Paris bought stock using the omnibus account, on the other hand, he typically delayed making any allocation to another account until the end of the day. This delay enabled Paris to watch how the stock performed during the trade day, which in turn allowed him to allocate trades based solely on the stock's intraday performance.

21.    When the price of the stock went up during the trade day, Paris often allocated it to himself. But when the price of the stock went down during the trade day, Paris often allocated the stock to the account of a BAM Client.

22.    In many cases, when a stock Paris bought increased in value, he locked in gains by selling the security in a day trade before allocating the winning trade to himself at the end of the trade day. Once he had guaranteed his profit, Paris then allocated both the purchase and the sale of the stock to himself, realizing an immediate profit for himself without having assumed any risk.

23.    By contrast, in many cases when a stock Paris bought in the omnibus account decreased in value, Paris allocated the losing trades to a BAM Client. Paris typically held these stocks in the BAM Client accounts beyond the trade day. The value of these holdings could either rise or fall after the trade

day. But Paris's fraudulent allocations unfairly deprived his clients of unrealized first-day profits, while saddling them with unrealized first-day losses.

24.     Paris often traded in the same securities as the BAM clients on consecutive days. For such trading, he usually outperformed his clients.

25.     The day trades that Paris allocated to himself generated a daily return of 0.94%, amounting to $626,058 in profits for himself. But the 60-day trades he allocated to BAM Clients during the Relevant Period had a -4.74% return, creating losses for his clients exceeding $100,000.

26.     Paris never told the affected clients about his cherry-picking.

### Trading at "Clearing Broker A" (December 2015 – February 2019)

27.     A "clearing broker" provides trade execution and clearing services to an "introducing broker," here BRAI, and serves as the custodian for the introducing broker's client accounts. Paris traded in omnibus accounts at two different clearing brokers during the Relevant Period.

28.     From December 9, 2015 until February 10, 2019 ("Broker A Period"), a clearing broker referred to in this Complaint as "Clearing Broker A" served as BRAI's clearing broker. Trades for the BAM clients were executed on Clearing Broker A's platform.

29.     During the Broker A Period, Paris could place trades for himself and the BAM Clients in two ways. Paris could buy or sell securities directly in his personal account or a BAM Client account. Alternatively, he could make

trades in an omnibus account and later allocate them to his personal account or to the BAM Clients' accounts.

30.     Throughout the Broker A Period, Paris chose to place trades for himself and the BAM Clients through the omnibus account. By using the omnibus account, Paris could wait until after the markets closed to allocate trades to a particular account. During this timeframe, Paris allocated about 93% of his trades after the close of trading.

31.     During the Broker A Period, Paris used a web-based application called "rep order entry" to enter all trades for himself and BAM Clients. Paris did not complete written order tickets or maintain other documentation for these trades. Thus, no one could review such trades to confirm that Paris had allocated them fairly.

32.     Only about half of all Paris's trades during the Broker A Period were profitable at the end of the first day. About 61.7% of the 2,703 trades Paris allocated from the omnibus account to himself, on the other hand, were profitable. This resulted in a first-day profit for Paris of $592,083 during the Broker A Period, representing a cumulative first-day return of 0.82%.

33.     By contrast, only 21.2% of the 1,219 trades that Paris allocated to the BAM Clients during the Broker A Period were profitable at the end of the trade day, creating a first-day loss for BAM's clients of $557,196 and a first-day return of -2.21%.

34.     The probability of these allocations occurring randomly is less

than one in a billion.

35.     Paris often locked in a profit for himself by closing out a position before he had even allocated the trade to himself. He did so for over 1,900 day trades during the Broker A Period, guaranteeing himself one-day returns of 0.99%. These risk-free day trades accounted for 96% of the total first-day profits in Paris's account during this timeframe.

36.     But if a trade was unprofitable on the first day, Paris usually allocated it to a BAM Client and then held the position in the Client account. A significant majority (68%) of all multi-day trades during this timeframe were unprofitable on the first day. Paris allocated 70% of those unprofitable trades to BAM's Clients, who consequently suffered first-day losses of $466,240 during the Broker A Period due to his unfair allocations.

37.     Here is an example of Paris's fraudulent conduct during the Broker A Period: On October 13, 2016, Paris bought 3,000 shares of Direxion Daily Gold Miners Index Bull 2X Shares ("NUGT"), an exchange-traded note tied to a market-cap-weighted index of large gold and silver mining firms, for $12.09 a share. He made this purchase in the omnibus account. Paris did not generate a trade order ticket or other contemporaneous documentation confirming for whom he intended the trade.

38.     Paris delayed making any allocation of the trade until after the market closed. This delay allowed him to monitor whether NUGT's price rose or fell during the rest of the trading day. At the end of the trading day, Paris

sold the 3,000 shares for $12.60 each, for a profit of $1,545 that he allocated to himself.

39.     The next day, Paris bought 4,000 shares of NUGT for $12.52 a share in the omnibus account. That afternoon, he sold all 4,000 shares for $11.79 each and allocated that trade, with its $2,897 in losses, to the BOF.

40.     The next trading day – October 17, 2016 – Paris bought 2,000 shares of NUGT for $11.99 a share in the omnibus account. He waited until after the market closed to allocate this trade. That afternoon, he sold the shares for $12.28 each and allocated that trade to himself with the $581 profit.

41.     Paris's trading in NUGT reflect classic cherry-picking; he picked the profitable trades for himself and allocated the unprofitable trades to Defendants' clients.

42.     This pattern pervades Paris's trading throughout the Broker A Period. The 50 best performing trades during this timeframe had first-day returns of between 9.9% and 23.0%, with total first-day profits of $129,506. Paris allocated all but one of these best performing trades to himself, representing 99.8% of the profits from those trades.

43.     On the other hand, Paris's 50 worst performing trades during the period had first-day losses of between 8.8% and 28.7%, with total first-day losses of $160,705. Paris allocated 43 of these 50 worst performing trades to BAM's clients, amounting to 84.8% of the first-day losses from those trades.

**Trading at "Clearing Broker B"**
**(February 2019 through October 2019)**

44.    From February 11, 2019 through October 11, 2019 ("Broker B Period"), BRAI cleared trades for the BAM clients through a different clearing broker, who is referred to in this Complaint as "Clearing Broker B".

45.    During the Broker B Period, BRAI placed all its trades, including for the BAM Clients and for Paris, in a single firm omnibus account. Although the trades had a corresponding order ticket purporting to reflect the intended allocation when the trade order was entered, Paris and other traders did not input the allocations into the system until later that day, including after the close. Paris usually performed the allocations for the trades that he initiated himself. During the Broker B Period, the BRAI electronic order system showed Paris as the client on almost all the trades he placed.

46.    Paris created written order tickets for his trades during the Broker B Period. Those tickets were usually inaccurate, incomplete, or inconsistent with the information reflected in BRAI's own electronic order system.

47.    Here is an example of Paris's cherry-picking misconduct during the Broker B Period: On August 20, 2019, Paris bought 3,000 shares of Whiting Petroleum Corp. ("WLL"), an oil and gas company whose stock trades on the New York Stock Exchange, for $8.16 a share. He placed the trade in an omnibus account. Later that day, Paris sold the stock for $8.42 a share and gave the trade to himself, along with the $770 in locked-in profits.

48.     The next day, August 21, 2019, Paris bought 3,000 shares of
WLL, this time for $8.55 a share, which he placed in the omnibus account. The
stock rose during the day, and that afternoon Paris sold the stock for $8.73 a
share. He allocated the trade – and the $529 in locked-in profits – to himself.

49.     The next day, August 22, 2019, Paris bought 5,000 shares of WLL
for $8.54 a share, which he placed in the omnibus account. The stock dropped
over the course of the day, closing at $8.21 a share. Paris gave the trade – with
its $2,200 in unrealized losses – to the clients in the BOF account.

50.     The same thing happened the next day, August 23, 2019. Paris
bought 2,500 shares of WLL for $7.55, which went in an omnibus account. By
trading day's end, the stock had dropped to $7.03. He allocated the trade to the
BOF, along with the $1,300 in unrealized losses.

51.     The next trading day, August 26, 2019, was more of the same.
Paris bought 4,000 shares of WLL for $7.11 per share, which he placed in an
omnibus account. The stock dropped during the trading day, closing at $6.78
per share. Paris gave the trade to his clients, who thus suffered another $1,300 in
unrealized losses.

52.     Whiting Petroleum's stock rebounded the next day, August 27,
2019. That morning Paris bought 5,000 shares of WLL for $6.68 a share, which
he put in an omnibus account. The stock rose to $6.80 by the end of the trading
day, and Paris allocated the trade to himself, with its unrealized profits of $615.

53.     The pattern described above manifested itself in Paris's trading in

other securities that he traded for both himself and Defendants' clients during the Broker B Period.

54. Only about half of the trades Paris placed in the omnibus account during the Broker B Period were profitable at the end of the trade day. Paris allocated over 55% of those profitable trades to himself, creating a first-day profit for himself of $59,494, a one-day return of 0.62%. Meanwhile, only 30.1% of the 142 trades allocated to the BOF account were profitable at the end of the trade day, generating a first-day loss for the BOF of $69,072 and a one-day return of -1.98%.

55. During the Broker B Period, Paris often locked-in a profit for his own account by selling positions that had increased in value during the trade day. He used this risk-free method to allocate 280 profitable day trades to himself after he had closed out the position, achieving a one-day return during the Broker B Period of 0.54%, amounting to $37,926.

56. The probability of Paris achieving such returns randomly was less than one in a billion.

57. Paris's trading throughout the Broker B Period reflects a pattern of picking the profitable trades for himself and allocating unprofitable trades to the BAM Clients. The 50 best performing trades Paris placed during this period had first-day returns of between 4.5% and 15.3%, with total first-day profits of $69,355. Paris allocated 47 of the 50 best performing trades to himself, representing 97.6% of the profits from those trades. The 50 worst performing

trades during the Broker B Period had first-day losses of between 3.2% and 9.1%, with total first-day losses of $60,684. Paris allocated 29 of these trades to the BAM Clients, saddling them with 68.9% of the first-day losses.

### The Results of Paris's Fraudulent Scheme

58.    Paris's ill-gotten gains during the Broker A Period and the Broker B Period were collectively more than $630,000 – the difference between the first-day profits from allocations to Paris, and his pro rata share of the cumulative losses on all trades in the omnibus accounts during the Relevant Period.

59.    Paris knowingly or recklessly engaged in a fraudulent scheme to cherry-pick securities trades for his personal benefit to the detriment of the BAM Clients. He also acted unreasonably when carrying out the cherry-picking scheme.

60.    Because Paris is a co-owner and principal of the firm, his state of mind in carrying out the cherry-picking scheme is imputed to BAM.

### BAM's Inaccurate Brochures

61.    During the relevant period, BAM filed various "Forms ADV" with the Investment Advisory Registration Depository. Investment advisers use the Form ADV to register with Commission or state securities authorities. The filing consists of two parts—Part 1 contains "check-the-box" information about the firm; Part 2 is a brochure, in narrative form, describing key information about the firm, including the types of services the firm provides. An investment

adviser must update its Form ADV annually, which it must make available to firm clients.

62.     From at least March 2016 through the present, BAM made false and misleading statements in its Brochures concerning trade allocations and review of employee trading. Paris worked with a consultant to draft the Brochures, and he reviewed and approved the statements in the Brochures before BAM disseminated them. All versions of BAM's Brochures contained the same language discussed below.

63.     First, the Brochures contained misleading statements about trade allocation, such as (1) "transactions [in the omnibus accounts] will be allocated among Barrington's clients in proportion to the purchase and sale orders placed for each client account on a given day"; and (2) "Barrington seeks to minimize the risk that any advisory client could be systematically advantaged or disadvantaged in connection with such batching and to ensure that all clients are treated fairly in the batching and allocation of portfolio transactions."

64.     These statements were misleading because – for at least Paris's cherry picking trades, and contrary to what it told its clients – BAM did not allocate the transactions among clients based on orders for each client. Rather, BAM allocated them based on whether the price of the security went up or down on that particular day.

65.     Contrary to BAM's representations in its Brochures, during the Broker A Period, the firm had no process for reviewing or confirming the

accuracy of allocations from the omnibus account.

66.    A reasonable investor reading the statement that "Barrington seeks to minimize the risk that any advisory client could be systematically advantaged or disadvantaged . . . and to ensure that all clients are treated fairly in the batching and allocation of portfolio transactions," would have assumed that BAM's had such processes.

67.    Second, the Brochures falsely stated that "no person employed by the firm shall prefer his or her own interest to that of an advisory client" and that "[e]mployee trading is reviewed on a regular basis." These statements are false because Paris engaged in a cherry-picking scheme to benefit himself at the expense of BAM Clients' accounts, and because no one reviewed the trading in Paris's account despite a written policy requiring a compliance or other officer to review employees' personal trades. Because Paris knew of his cherry-picking scheme, he also knew these statements were false.

68.    A reasonable investor would have wanted to know that BAM was not adhering to its own procedures for ensuring that BAM Clients were treated fairly and that, contrary to the Brochures' representations, Paris preferred his own interest to that of an advisory client.

69.    Defendants knew that because of the cherry-picking scheme the Brochures' representations – that BAM allocated portfolio transactions based on purchase and sale orders, and that no person employed by the firm would prefer his own interest to that of an advisory client – were false.

## COUNT I

### Violations of Section 17(a) of the Securities Act
### (Against Both Defendants)

70.     Paragraphs 1 through 69 are realleged and incorporated by reference as though fully set forth herein.

71.     By engaging in the conduct described above, Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have (a) employed devices, schemes and artifices to defraud; (b) obtained money and property by means of untrue statements of material fact and by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

72.     Defendants obtained money or property by means of the scheme and the misrepresentations, in the form of advisory fees they collected from their defrauded clients. Paris also obtained illicit profits through his scheme, as set forth above, which BAM enabled by failing to review Paris's trading and allocations.

73.     Defendants acted knowingly, or with extreme recklessness, in engaging in the scheme and the misrepresentations described above. Paris's

scienter is imputed to BAM.

74.     Defendants also acted negligently in engaging in the conduct described above.

75.     By engaging in the conduct described above, Defendants violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

**COUNT II**

**Violations of Section 10(b) of the Exchange Act,<br>
and Exchange Act Rule 10b-5<br>
(Against Both Defendants)**

76.     Paragraphs 1 through 69 are realleged and incorporated by reference.

77.     As detailed in paragraphs 1 through 69 above, Defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

78.     Defendants acted knowingly, or with extreme recklessness, in engaging in the fraudulent conduct described above. Paris's scienter is imputed to BAM.

79.     Through the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT III

### Violations of Advisers Act Sections 206(1) and 206(2)
### (Against Both Defendants)

80.     Paragraphs 1 through 69 are realleged and incorporated by reference.

81.     As detailed in paragraphs 1 through 69 above, at all times alleged here, Defendants, while acting as investment advisers, and in breach of their fiduciary duties, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, knowingly, willfully or recklessly: (i) employed devices, schemes or artifices to defraud its clients or prospective clients; and (ii) engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon its clients or prospective clients.

82.     Defendants as investment advisers owed affirmative fiduciary duties of loyalty, fairness and good faith to their discretionary account customers. These duties required Defendants to, among other things, act in the best interest of their customers when making trading or allocation decisions.

Defendants violated Sections 206(1) and 206(2) and breached their fiduciary duties by engaging in the cherry-picking scheme discussed above, and by making materially misleading statements in BAM's brochures.

83.     Defendants acted knowingly, or with extreme recklessness, in engaging in the scheme and the misrepresentations described above. Paris's scienter is imputed to BAM.

84.     Defendants also acted negligently in engaging in the conduct described above.

85.     Through the foregoing, Defendants violated Sections 206(1) and 206(2) of the Advisers Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## COUNT IV
### Aiding and Abetting Violations of
### Advisers Act Sections 206(1) and 206(2)
### (Pled in the Alternative to Count III Against Defendant Paris Only)

86.     Paragraphs 1 through 69 are realleged and incorporated by reference.

87.      As detailed in paragraphs 1 through 69 above and as alleged in Count III above, Defendant BAM committed primary violations of Sections 206(1) and 206(2) of the Advisers Act.

88.     Defendant Paris knowingly or recklessly provided substantial assistance to Defendant BAM's violations by, among other things, breaching his fiduciary duties of loyalty, fairness and good faith to his discretionary account customers by engaging in the cherry-picking scheme discussed above,

and by making materially misleading statements in BAM's brochures.

89.     Defendant Paris also acted negligently in engaging in the conduct described above.

90.     By reason of the foregoing and pursuant to Section 209(f) of the Advisors Act [15 U.S.C. § 80b-9(f)], Defendant Paris, knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Defendant BAM's violations of Sections 206(1) and (2) of the Advisors Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## RELIEF REQUESTED

**WHEREFORE,** the Commission requests that this Court:

## I.

Permanently enjoin Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the order of this Court, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) [15 U.S.C. § 78j] and Rule 10b-5 of the Exchange Act [17 CFR § 240.10b-5]; and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## II.

Order Paris to disgorge the ill-gotten gains received because of the

violations alleged here, including prejudgment interest, pursuant to Section

21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), and

78u(d)(7)].

## III.

Order Defendants to pay civil penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)]; Section 21(d)(3) of the Exchange Act [15

U.S.C. § 78u(d)(3)]; and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-

9(e)].

## IV.

Grant any other relief this Court deems appropriate.

## JURY DEMAND

The Commission requests a trial by jury.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: /s/ Jonathan S. Polish
Jonathan S. Polish
Peter Senechalle
Attorneys for Plaintiff
**U.S. SECURITIES AND
  EXCHANGE COMMISSION**
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

Dated: June 28, 2021