IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States Securities and Exchange Commission, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 21-cv-3450 |
| v. | ) ) | Judge Joan B. Gottschall |
| Gregory David Paris and Barrington Asset Management, Inc., | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The United States Securities and Exchange Commission ("SEC") filed a four-count amended complaint against Gregory D. Paris ("Paris") and the investment advisory firm of which he is an officer, Barrington Asset Management, Inc. ("BAM"), alleging that defendants executed a "fraudulent cherry-picking scheme" from at least December 2015–October 2019 ("relevant period"). *See* Am. Compl. ("AC") ¶ 1, ECF No. 8. As described in the amended complaint, cherry-picking occurs "when an investment adviser defrauds his clients by purchasing stock and then waiting to see whether the price of the stock goes up, or down, before allocating the trade" to either a favored account, here Paris's personal trading account, if the trade turns a profit, or to the client if the trade nets a loss. *See* AC ¶ 2. The SEC alleges that Paris obtained more than $630,000 in ill-gotten gains at his clients' expense. AC ¶¶ 1–3. The SEC also alleges that defendants made related, material misrepresentations in documents sent to investors. *See* AC ¶ 4.

Paris and BAM move to dismiss the amended complaint for failure to state a claim upon which relief can be granted. Defendants primarily argue that the SEC's cherry-picking allegations rest solely on inferences drawn from statistical analyses of Paris's trading activities,

and those statistics do not satisfy Federal Rule of Civil Procedure 9(b)'s heightened standard for pleading claims sounding in fraud. Because the amended complaint pleads fraud with the particularity required by Rule 9(b) and is otherwise sufficient, the court denies the motion.

## I. The Amended Complaint

Defendants' Federal Rule of Civil Procedure 12(b)(6) motion tests the amended complaint's legal sufficiency, not the case's merits. *See Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020) (citing *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 526 (7th Cir. 2015)). The court therefore accepts as true, for purposes of resolving defendants' motion to dismiss, the following well-pleaded factual allegations in the amended complaint and draws all reasonable inferences from those facts in favor of the SEC. *See Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 584 (7th Cir. 2021) (citing *Taha v. Int'l Brotherhood of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020)).

### A. The Parties and Related Entities

Based in Chicago, defendant BAM is registered as an investment adviser in Illinois and Georgia. AC ¶ 12. Paris, a licensed attorney and certified public accountant, owns 15% of BAM. AC ¶¶ 11–12. Paris and his brother direct BAM's day-to-day operations; Paris serves as BAM's vice president, chief compliance officer, and chief operations officer. AC ¶¶ 11–12. Paris also owns 28% of the equity in Barrington Research Associates, Inc. ("BRAI"), a Chicago-based broker-dealer providing research services primarily to institutional clients on small cap stocks and trade execution. AC ¶ 13. BRAI executes all trades for BAM clients. *Id.*

BAM advises approximately 45 clients and the Barrington Opportunity Fund ("BOF"), a private investment fund with approximately $2.4 million in assets at the relevant time. AC ¶ 14. Paris made investment decisions for the BOF and ten of BAM's individual clients. AC ¶ 15.

B.  **Cherry-Picking Allegations**

The following excerpts from the amended complaint describe the alleged cherry-picking scheme as follows:

> 17.    An investment adviser sometimes uses an omnibus account when making a large purchase of stock for several different clients at the same time. In general, an omnibus trading account allows an investment adviser to buy and sell securities on behalf of multiple clients simultaneously, without identifying to the broker the specific accounts for [sic] which a trade is intended in advance.
>
> 18.    For example, if an adviser separately purchases the same security for several clients on the same day, the adviser might obtain different prices on each transaction because of normal market fluctuation. Rather than placing individual orders in each client account, the adviser can place an aggregated order, or "block trade," in the omnibus account and later allocate the trade among multiple accounts using an average price.
>
> 19.    When used properly, an adviser will fairly allocate the block trade from the omnibus account among client accounts, ensuring that no account receives preferential treatment over another.
>
> 20.    When Paris bought stock using the omnibus account, on the other hand, he typically delayed making any allocation to another account until the end of the day. This delay enabled Paris to watch how the stock performed during the trade day, which in turn allowed him to allocate trades based solely on the stock's intraday performance.
>
> 21.    When the price of the stock went up during the trade day, Paris often allocated it to himself. But when the price of the stock went down during the trade day, Paris often allocated the stock to the account of a BAM Client.
>
> 22.    In many cases, when a stock Paris bought increased in value, he locked in gains by selling the security in a day trade before allocating the winning trade to himself at the end of the trade day. Once he had guaranteed his profit, Paris then allocated both the purchase and the sale of the stock to himself, realizing an immediate profit for himself without having assumed any risk.
>
> 23.    By contrast, in many cases when a stock Paris bought in the omnibus account decreased in value, Paris allocated the losing trades to a BAM Client. Paris typically held these stocks in the BAM Client accounts beyond the trade day. The value of these holdings could either rise or fall after the trade day. But Paris's fraudulent allocations unfairly deprived his clients of unrealized first day profits, while saddling them with unrealized first day losses.

AC ¶¶ 17–23.

The SEC also alleges that Paris "often traded" in the same stocks as his clients on consecutive days, and he "usually outperformed his clients." AC ¶ 24. Overall, the day trades Paris allocated to himself during the relevant period netted him $626,058 in profits (0.94% net return) while the day trades allocated to Paris's clients during the relevant period resulted in over $100,000 in losses (-4.74% net return). AC ¶ 25.

"A 'clearing broker' provides trade execution and clearing services to an 'introducing broker,' here BRAI, and serves as the custodian for the introducing broker's client accounts." AC ¶ 27. Paris placed trades through two different clearing brokers during the relevant period: clearing broker A from December 2015–February 2019 and clearing broker B from February–October 2019. AC ¶¶ 27–28, 46.

1. *Broker A Period: December 2015–February 2019.*

Using a web application, Paris placed personal and BAM client trades via an omnibus account during the broker A period, though he had the option of entering personal and client trades separately. AC ¶¶ 29–31. He allocated about 93% of trades after the end of the trading day. AC ¶ 30. Paris did not create any documentation during the broker A period, such as "trade order tickets," that would allow others to verify that he was allocating trades fairly. AC ¶¶ 31, 39. Paris engaged in "day trading," buying and selling a stock on the same day, and multi-day trading. AC ¶¶ 35–37.

The SEC provides an example of what it calls "classic cherry-picking" in Paris's trades over three consecutive trading days from October 13–17, 2016. *See* AC ¶¶ 39–43. Each day, Paris bought shares of Direxion Daily Gold Miners Index Bull 2X Shares ("NUGT") using the omnibus account, sold the shares later the same day, and allocated the trade after the trading day ended. *See* AC ¶¶ 39–42. On the first day, Paris bought 3,000 NUGT shares for $12.09 each. AC ¶ 39. He sold them at the end of the trading day for $12.60 each and allocated the profitable

4

trade ($1,545) to himself. AC ¶ 40. Paris's trades lost money on the second day. He bought 4,000 NUGT shares at $12.52 per share and sold them for $11.79 each. AC ¶ 41. After trading ended, Paris allocated this trade, and the $2,897 loss, to BOF. *Id.* Paris day traded NUGT again the next trading day. This time he made a $581 profit from his afternoon sale of NUGT. AC ¶ 42. Paris allocated this trade to himself. *Id.*

The SEC pleads the following statistics for the broker A period:

- About half of Paris's trades turned a profit on the first day. *See* AC ¶¶ 32, 35–36. Approximately 61.7% of the trades Paris allocated to himself were profitable. AC ¶ 32. Of the trades Paris allocated to BAM clients, 21.2% turned a profit at the end of day one. AC ¶ 33.

- In all, BAM clients lost $557,136 in net first-day losses. AC ¶ 33. Paris gained $592,083 in first-day profits. AC ¶ 32.

- "The probability of these allocations occurring randomly is less than one in a billion." AC ¶ 34.

- If a multi-day trade was unprofitable after the first day, Paris "usually" allocated the trade to a BAM client. AC ¶ 37. Regarding these multi-day trades, Paris allocated 70% of the trades that were unprofitable at the end of the first day to BAM clients. *See* AC ¶¶ 37–38.

- Eight of the 51 day trades Paris allocated to BAM clients turned a profit. AC ¶ 36. About 66.75% (1,287 of 1,928) of the day trades Paris allocated to himself were profitable. *See* AC ¶ 35. Paris achieved an overall 0.99% profit on his day trades while BOF lost over $90,000 in the day trades allocated to it. AC ¶¶ 35–36.

- Paris allocated 43 of his 50 worst performing first day trades to BAM clients, resulting in $160,705 in losses. AC ¶ 45. By contrast, Paris allocated 49 of the 50 most profitable first day trades to himself, resulting in $129,506 in profits for him. AC ¶ 44.

2. Broker B Period: February–October 2019

Paris placed all trades during the broker B period through an omnibus account shared by BRAI traders. *See* AC ¶ 46–47. Unlike the broker A period, Paris made use of BRAI's "electronic order system" for inputting trade allocations. *See id.* Nonetheless, "Paris and other

5

traders did not input the allocations into the [BRAI] system until later that day, including after the close [of the trading day]. Paris usually performed the allocations for the trades that he initiated himself." AC ¶ 47. "During the Broker B Period, the BRAI electronic order system showed Paris as the client on almost all the trades he placed." *Id*.

Paris also prepared written "order tickets" showing trade allocations during the broker B period. AC ¶ 48; *see also* Mot. Dismiss Ex. 3, ECF No. 16-3 (sample trade order tickets).[1] The SEC alleges that those tickets "were usually inaccurate, incomplete, or inconsistent with the information reflected in BRAI's own electronic order system." *Id*.

As an example of Paris's "pattern" of cherry-picking during the broker B period, the SEC pleads Paris's day trading in Whiting Petroleum Corp. ("WPC") on consecutive trading days from August 20–27, 2019. *See* AC ¶¶ 49–54. Paris made a profit on both of the first two days and allocated both trades to himself. AC ¶¶ 49–50. He lost money trading WPC on each of the next three trading days and allocated each loss to a BAM client. *See* AC ¶¶ 51–53. Then, Paris bought 5,000 shares of WPC stock for $6.28 per share on August 27 and sold them later that day for $6.80. AC ¶ 54. Paris allocated this profitable trade to himself. *Id*.

The SEC pleads the following statistics on the broker B period:

- About half of Paris's trades turned a profit on the first day. *See* AC ¶ 56. Paris allocated approximately 55% of those profitable trades to himself. *Id*. Of the trades Paris allocated to BOF, 30.1% turned a profit at the end of day one. *Id*.

- One of the eight day trades Paris allocated to BOF clients turned a profit. AC ¶ 57. About 53.92% (151 of 280) of the day trades Paris allocated to himself were profitable. *See id*. Paris achieved an overall 0.54% profit on his day trades while BOF suffered a net loss of $11,191. *Id*.

---

1    The court considers exhibits 2–3 to defendants' motion to dismiss, ECF Nos. 16-2 and 16-3, without converting the motion to one for summary judgment, *see* Fed. R. Civ. P. 12(d), because the amended complaint references the exhibits, and they are central to the SEC's claims. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (citation omitted).

- "The probability of Paris achieving such returns randomly was less than one in a billion." AC ¶ 58.

- Paris allocated 29 of his 50 worst-performing first day trades to BAM clients, resulting in BAM clients taking 68.9% of the first day losses from these trades. AC ¶ 59. By contrast, Paris allocated 47 of the 50 most profitable first-day trades to himself, giving himself 97.6% of the first-day profits. *Id*.

### C. False or Misleading Statements in Brochures

The SEC alleges that, beginning in March 2016 and continuing through the relevant period, BAM's "Forms ADV," which Paris approved, contain materially false or misleading statements. *See* AC ¶¶ 63–65, 69. Investment advisers must file these forms to register with the SEC and state securities regulators and must make them available to clients. AC ¶ 63. The Forms ADV consist of a "check the box" form, not at issue here, and a narrative brochure with key information about the investment advisory firm. *Id.*; *see also* Mot. Dismiss Ex. 2, ECF No. 16-2 (BAM Form ADV Part 2: Firm Brochure dated March 31, 2016).

The SEC identifies the following statements in BAM's brochures as false or misleading: (1) "transactions [in the omnibus accounts] will be allocated among Barrington's clients in proportion to the purchase and sale orders placed for each client account on a given day;" (2) "Barrington seeks to minimize the risk that any advisory client could be systematically advantaged or disadvantaged in connection with such batching and to ensure that all clients are treated fairly in the batching and allocation of portfolio transactions;" (3) "no person employed by the firm shall prefer his or her own interest to that of an advisory client;" and (4) "[e]mployee trading is reviewed on a regular basis." AC ¶¶ 65, 69 (alterations in original). The first two statements were false or misleading, according to the amended complaint, because BAM had no system in place during the broker A period for monitoring the allocation of transactions in the omnibus account and because defendants allocated transactions during the relevant period based

7

on whether a stock's price rose or fell during the day. *See* AC ¶¶ 66–68. As for the latter two statements, the SEC pleads that they were false or misleading:

> because Paris engaged in a cherry-picking scheme to benefit himself at the expense of BAM Clients' accounts, and because no one reviewed the trading in Paris's account despite a written policy requiring a compliance or other officer to review employees' personal trades. Because Paris knew of his cherry-picking scheme, he also knew these statements were false.

AC ¶ 69.

### D. Claims for Relief

The amended complaint has four counts. The SEC's claims arise under §§ 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3); § 10(b) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. § 77j(b); Rule 10b-5 (promulgated under the Exchange Act, 17 C.F.R. § 2410.10(b)(5)); and §§ 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

Counts I and II assert claims that defendants violated § 17(a) of the Securities Act (count I) and § 10(b) of the Exchange Act, as Rule 10b-5 (count II), predicated on the alleged cherry-picking scheme and BAM's failure to detect it and monitor trade allocations. *See* AC 17–19. In count III, the SEC claims that both defendants violated §§ 206(1) and 206(2) of the Advisers Act in that they breached their fiduciary duties to their clients through the cherry-picking scheme and by making false or misleading statements in BAM's brochures. AC 20–21.

The SEC pleads count IV against Paris only and in the alternative to count III under the same sections of the Advisers Act. *See* AC 21. The SEC alleges that Paris aided and abetted BAM's violations of the Advisers Act "by engaging in the cherry-picking scheme discussed above, and by making materially misleading statements in BAM's brochures." AC ¶ 90.

## II.  Standard for Motion to Dismiss

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires every complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8(a)(2) requires a complaint to contain more than "labels and conclusions or a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); internal quotation marks omitted). Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570). The plausibility standard does not demand "detailed factual allegations" and "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 555, 556). Thus, while the court accepts well-pleaded factual allegations in a complaint as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and do not enjoy a presumption of truth. *Id.* (quoting *Twombly*, 550 U.S. at 555). Deciding whether a complaint satisfies Rule 8(a)(2) is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

In addition to Rule 8(a)(2), the SEC's securities fraud allegations must satisfy Rule 9(b)'s heightened standard for claims sounding in fraud.[2]  *See Cornielsen v. Infinium Cap. Mgmt., LLC*,

---

2  Paris and BAM do not ask the court to apply the Private Securities Litigation Reform Act of 1995's ("PSLRA") additional pleading requirements, *see* 15 U.S.C. § 78u-4(b)(2)(A), to the SEC's amended complaint. *See* Mem. Supp. Mot. Dismiss 8, ECF No. 16. On the contrary, they contend in their reply that "the SEC is not subject to the Private Securities Litigation Reform Act." ECF No. 31 at 6 n.6. District courts have divided over whether the PSLRA applies to complaints filed by the SEC. *See SEC v. Kameli*, 373 F. Supp. 3d 1194, 1201 (N.D. Ill. 2019) (citing *SEC v. Steffes*, 805 F. Supp. 2d 601, 615–16 & n.12 (N.D. Ill. 2011)). Here, this court need not determine whether the PSLRA (continued on next page)

916 F.3d 589, 598 (7th Cir. 2019) (citing *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)); *SEC v. Kameli*, 373 F. Supp. 3d 1194, 1201 (N.D. Ill. 2019) (citations omitted). Rule 9(b) provides, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), the complaint ordinarily must describe "the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 15 (7th Cir. 2011) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011)). "The purpose of this particularity requirement is 'to discourage a sue first, ask questions later philosophy.' " *Cornielsen*, 916 F.3d at 598 (quoting *Pirelli*, 631 F.3d at 441); *see also Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994).

### III. Analysis

Defendants do not dispute–and this court finds–that the amended complaint sets out the who, when, where, and how of the alleged fraud in accordance with Rule 9(b). *See*, Part I.B–I.C, *supra*; Mem. Supp. Mot. Dismiss 8, ECF No. 16. They contend, however, that the 'what' of the fraud has not been sufficiently alleged because the SEC relies exclusively on statistics to support its allegations of cherry-picking. Mem. Supp. Mot. Dismiss 8–11. Defendants further argue that the amended complaint and BAM's brochures (Forms ADV) establish an innocent explanation for Paris's profits and his clients' losses–Paris employed a day trading strategy for his individual investments and a long-term trading strategy for BAM's clients. *See id.* at 11–18. Finally, Paris and BAM contend that the trade order tickets Paris prepared during the broker B period

---

applies to SEC enforcement actions because "[d]efendants confine their heightened pleading analysis to Rule 9(b)." *Id*.; *accord SEC v. Winemaster*, 529 F. Supp. 3d 880, 910 n.8 (N.D. Ill. 2021).

10

contradict the SEC's fraud allegations and that the amended complaint fails to plead how the trade order tickets were inaccurate or incomplete. *See id.* at 18–19.

Defendants ask this court to hold that the SEC must plead "something more" than trading statistics consistent with cherry-picking to state a securities fraud claim.³ Mem. Supp. Mot. Dismiss 8–11. As primary support, defendants quote (*e.g.*, Mem. Supp. Mot. Dismiss 1, 8–9) *SEC v. Strong Investment Management*, 2018 WL 8731559, at *6 (C.D. Cal. Aug. 9, 2018), a nonbinding case in which the district court denied a motion to dismiss a complaint with cherry-picking allegations. *See* Mem. Supp. Mot. Dismiss 8–9. In context, the quoted passage from *Strong* reads:

> Here, at the pleadings stage, the Court *will not decide* whether the statistics proffered by the SEC were the result of differing investment strategies or the product of fraud. The SEC has alleged the "[s]omething more" needed "to exclude the possibility" that the innocent explanation is true by alleging, for example, that Bronson[the adviser] prepared fraudulent documents to give the impression that trade allocations were made prior to execution and misrepresented to clients the reason for Broker 1's decision to terminate SIM.

*Id.* (emphasis added) (footnote and internal citations omitted) (citing *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013)).

---

3   In contrasting this case with other complaints filed by the SEC, defendants submit that in the comparator suits "the 'something more' [than statistics] includes allegations that the defendant's favored account had such a high 'win rate'—*i.e.*, percentage of trades with positive Day 1 Returns—that it was likely the result of fraud." Mem. Supp. Mot. Dismiss 12. That is, defendants argue that the "something more" consisted of statistics regarding the trader's success rate. Defendants therefore appear to concede that, at least in some circumstances, sufficiently compelling statistics suffice to state a claim of securities fraud without more. Cf. *Barry v. Cboe Glob. Markets, Inc.*, ___ F.4th ___, 2022 WL 2965389, at *1–2 (7th Cir. July 27, 2022). Defendants suggest no way to determine the minimum win rate at which the SEC must plead "something more." *See* Mem. Supp. Mot. Dismiss 12.

As the emphasized language shows, the *Strong* court did not decide whether the complaint's statistical allegations were independently sufficient to state a claim, so the case does not support defendants' argument for a pleading rule requiring statistics plus "something more."[4]

Regardless, the court need not decide whether "something more" than statistics must invariably be pleaded because the amended complaint goes well beyond statistics.[5] Defendants have collected several examples of cherry-picking cases in which the plaintiff alleged "something more" than statistics, such as allegations that the defendant's broker flagged suspected cherry-picking activity, that an adviser traded in the same securities as his clients on the same day but received a more favorable price than his clients, and that the adviser allocated trades differently than originally indicated or, in defendants' words, "the allocation decision was made after the fact."

---

4  Defendants also cite *CP Stone Fort Holdings, LLC v. Doe(s)*, 2016 WL 5934096, at *2, 6 (N.D. Ill. Oct. 11, 2016). *See* Mem. Supp. Mot. Dismiss 10. The court in *CP Stone* dismissed a complaint alleging that defendants engaged in a "well defined pattern" of spoofing the market. 2016 WL 5934096, at *2. This pattern involved placing orders on one side of the market to create an artificial impression of demand. *Id*. The defendant then cancelled those orders and almost simultaneously (within milliseconds) placed the same number of orders on the other side of the market. *Id*. The problem in *CP Stone* was not that the complaint failed to allege "something more" than statistical information. Rather, relying on and extending *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995), Judge Gettleman held that the type of open market conduct alleged in the complaint failed to state a market manipulation claim under § 10(b) of the Securities Act. *See id.* at *5–6.

5  To be sure, in certain contexts allegations based on statistics may be "merely consistent" with fraud or wrongdoing, which is not enough to state a plausible claim. *Iqbal*, *supra*, 556 U.S. at 678; *see also Century Aluminum*, 729 F.3d at 1108); *Last Atlantis Cap. LLC v. Chi. Bd. Options Exch., Inc.*, 455 F. Supp. 2d 788, 792–93 (N.D. Ill. 2006) (PSLRA case decided based on plaintiffs' concession, not made here). But it does not necessarily follow, and defendants cite no case holding, that statistical allegations invariably fall below the pleading standard for securities fraud suits brought by the SEC alleging cherry-picking. Such a rigid pleading rule would be at odds with the "context-specific" approach required by Rule 8(a)(2), *Iqbal*, 556 U.S. at 679, and the Seventh Circuit's fact-specific approach to Rule 9(b). *See AnchorBank, supra*, 649 F.3d at 615 (stating that what is needed to satisfy Rule 9(b) "will necessarily differ based on the facts of the case" (citation omitted)).

Contrary to defendants' contentions, the amended complaint contains well-pleaded allegations comparable to the latter two examples they identify as sufficient to state a claim. First, although Paris did not trade in the same securities as his clients on the same day, he traded in the same stocks on consecutive days and allocated the trades either to himself or a client, depending on the results of the trades. *See* AC ¶¶ 39–42, 49–54. The two examples in the amended complaint portray a pattern of allocating profitable trades to Paris and unprofitable ones to clients. *See id.* As other district courts have found, well-pleaded allegations of this type go beyond statistics consistent with cherry-picking and satisfy Rule 9(b). *See SEC v. RRBB Asset Mgmt., LLC*, 2021 WL 3047081, at *3 (D.N.J. July 20, 2021); *Strong*, 2018 WL 8731559, at *2–3, 6. Second, the amended complaint contains plausible allegations that Paris allocated trades to himself after the trade was complete, usually after trading closed for the day, depending on how the trade had performed. *See* AC ¶¶ 23, 30, 40, 47. These well-pleaded allegations further bolster the SEC's cherry-picking claims at the complaint stage. *See RRBB Asset Mgmt.*, 2021 WL 3047081, at *3; *Strong*, 2018 WL 8731559, at *1, 6.

Although the above well-pleaded facts are enough to satisfy Rule 9(b), the amended complaint contains more. The SEC pleads that Paris used no written trade order tickets during the broker A period, that during the broker B period he prepared written trade order tickets that were "usually" inaccurate or incomplete, and that Paris's name was entered in BRAI's order tracking system as the client for nearly all trades during the broker B period. *See* AC ¶¶ 29–31, 47–48.

Defendants assert that some of these allegations lack factual specificity and effectively ask the court to view others as consistent with innocent conduct. *See* Reply 7–8, ECF No. 31. For instance, they assert in their reply brief that the BRAI electronic order tracking system

13

defaults to the trader's name in the client field and that this fact accounts for Paris's name appearing as the client for nearly all orders during the broker B period. *Id*. at 8. But the amended complaint alleges nothing concerning the default behavior of the BRAI software. *See* AC ¶¶ 47–48. Accepting defendants' assertions about how the BRAI system works therefore requires an inference in their favor. Drawing such an inference would violate the cardinal principle that the court must "accept the allegations in the plaintiff's complaint as true and draw all reasonable inferences in plaintiff's favor" on a Rule 12(b)(6) motion. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 584 (7th Cir. 2021) (citing *Taha v. Int'l Brotherhood of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020)). Taking the amended complaint in the light most favorable to the SEC, it is plausible that Paris was intentionally leaving his options open to cherry-pick trades when he allowed his name to be entered as the client in the BRAI system. *See* AC ¶ 47.

The court also cannot draw an inference favorable to defendants that Paris's use of trade order tickets during the broker B period, accurate or not,[6] exculpates him. *See* Reply 7. Instead, it is reasonable to infer favorably to plaintiff that Paris began preparing trade order tickets only after switching to broker B made it necessary because all BRAI traders were forced to use a single omnibus account. *See* AC ¶ 46–47. Viewed favorably to the SEC, Paris's failure to use trade order tickets in the broker A period, while representing to clients that BAM had systems in place to monitor trade allocations, can be seen as a conscious effort to avoid creating a paper trail that would expose Paris's cherry-picking. *See* AC ¶¶ 60–64.

---

6    The court agrees with defendants that the amended complaint's allegations that the written trade order tickets prepared during the broker B period "were usually inaccurate, incomplete, or inconsistent with the information reflected in BRAI's own electronic order system" is too conclusory to satisfy Rule 9(b). AC ¶ 48. The amended complaint fails to specify what, specifically, was inaccurate or incomplete, even in a general way, and how this information is material. *See id.*; *U.S. ex rel. Fowler v. Caremark RX, Inc.*, 2006 WL 3469537, at *7 (N.D. Ill. Nov. 30, 2006), *aff'd sub nom. U.S. ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730 (7th Cir. 2007). The court therefore does not rely on this allegation as a basis for finding the amended complaint sufficient.

Finally, defendants maintain that the court should view the BAM brochures (Forms ADV) favorably to them and infer from Paris's pattern of trading activity that he employed different trading strategies in his personal account, where he day traded, and for his clients, for whom he used a longer-term strategy. *See* Mem. Supp. Mot. Dismiss 4–7; Reply 8–13. Courts have declined to resolve similar arguments at the pleading stage, stating that determining whether different trading strategies explain the trader's activities "requires consideration of a variety of evidence." *RRBB Asset Mgmt.*, 2021 WL 3047081, at *3 (citing *Strong*, 2018 WL 8731559, at *6 & n.2 (other citations omitted)); *see also Moross Ltd. P'ship v. Fleckenstein Cap., Inc.*, 466 F.3d 508, 515–17 (6th Cir. 2006); *SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 173 (D.R.I. 2004) (resolving such an argument favorably to the defendants after a bench trial). That approach is equally sound here. The brochures (actually, only the March 2016 brochure is in the record, but no one suggests the others are different) tell investors that a strategy will be selected "consistent with the client's investment objectives, risk tolerance, and time horizons, among other considerations." Mot. Dismiss Ex. 2 at 8. The brochures describe six possible strategies the trader may use, including "Long-Term Purchases," meaning assets intended to be held for at least a year; "Short-Term Purchases," meaning assets intended to be held for 30 days to a year; and "Trading," defined as buying an asset with an intent to sell "typically within 30 days or less." *See id.* at 8–9; Mem. Supp. Mot. Dismiss 6–7; Reply 12. Read favorably to the SEC, this language in BAM's Forms ADV does not commit to any one trading strategy.

Furthermore, the amended complaint contains well-pleaded contradictory facts that can reasonably be seen as inconsistent with Paris's use of a longer term strategy for clients than he used for himself. Those well-pleaded contradictory facts consist of the two examples, alleged to

15

be typical of Paris's day trading, of Paris's day trading in the same stock and allocating the trade to himself or a client depending on its intraday performance. *See* AC ¶¶ 39–43, 49–55. Why day trade for a client, disproportionately at a loss, if the trader is using a long-term strategy? One plausible inference is that Paris deviated from a long-term strategy to allocate losing day trades to clients. Other inferences are of course possible. Resolution of this issue must await a fully developed record. *See RRBB Asset Mgmt.*, 2021 WL 3047081, at *3.

In sum, the amended complaint pleads "something more" than statistics consistent with cherry-picking. That is, the amended complaint's well-pleaded allegations, taken as a whole, satisfy the requirements of Rules 8(a)(2) and 9(b). Accordingly, defendants' motion to dismiss the amended complaint is denied. The court implies nothing about the SEC's claims beyond a finding that the amended complaint is legally sufficient.

Dated: August 1, 2022                              /s/
                                                                                             Joan B. Gottschall
                                                                                             United States District Judge