IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 21 cv 3450 |
| GREGORY DAVID PARIS and BARRINGTON ASSET MANAGEMENT, INC. | ) ) ) ) | Judge Joan B. Gottschall |
| Defendants. | ) ) ) | |
| _____ | ) | |

**PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF GREGORY J. REGAN**

The SEC retained Greg Regan, a seasoned forensic economics expert, to analyze defendant Greg Paris's trades. Regan ran a battery of statistical tests using the trading data. He concluded—among other opinions—that the probability that the differences in profits and returns between Paris's personal accounts and client accounts result from random chance is close to zero.

Defendants make two main arguments why Regan's testimony should be excluded.

They argue that Regan didn't limit his analysis to those trades for which Paris was responsible. Strewn among the purchases that Regan analyzed, they insist, were trades that Paris only made because he was told to—either by his clients or his colleagues at Barrington. As a result, they say, Regan's entire analysis is structurally unsound and should be disregarded.

The record is clear that Regan methodically, painstakingly reviewed the evidence and excluded any trades that weren't Paris's idea. While they engage in nitpicking on the margins about a few trades here or there, that's fodder for cross-examination, not a *Daubert* motion.

Defendants also argue that "Regan's comparison of 'First Day' performance is essentially meaningless because Paris employed different trading strategies, with different objectives and different time horizons, when he purchased securities for his own account and for client accounts," and that he "fails to account for or exclude other possible explanations, namely that the performance differences that he identifies are attributable to different trading strategies."

Overwhelming evidence establishes otherwise. *First*, Regan testified that he did search for evidence that any of Paris's particular trades stemmed from a specific trading strategy. But Paris testified that he could not link particular trades to a specific strategy. The lack of any such evidence meant there was nothing tangible for Regan to test. *Second*, Paris's own testimony conflicts with his argument that he employed a long-term trading strategy for his clients. Rather,

1

he testified that he disproportionately focused on the hedging and opportunistic strategies for his clients. He testified that he placed hedge trades "often." *Third*, Regan concluded that of the trades Paris allocated to his clients, only 21% during the NFS Period, and 34% during the Wedbush Period, were profitable after the First Day. Defendants fail to explain how any long-term trading strategy would have resulted in Paris's clients achieving such dismal First Day Results. For these reasons, the motion should be denied.

## Regan's Qualifications

Greg Regan received his B.S. degree in Accounting from Georgetown University, and his MBA in Finance from the University of San Francisco. (*See* Def. Ex. 1, Expert Report of Greg Regan, App. A.)[1] He has testified in many federal and state courts and arbitrations regarding forensic analyses, accounting investigations, economic damage analyses and shareholder disputes, among other issues. *Id.; see also SRS Acquiom Inc. v. PNC Fin. Servs. Grp., Inc.,* No. 19-cv-2005, 2023 WL 6796431, at *1 (D. Colo. July 7, 2023) ("I find that Mr. Regan's testimony uses sufficiently reliable data and methodology and could help a finder of fact understand evidence or determine a fact at issue."); *Sumotext Corp. v. Zoove, Inc.*, No. 16-CV-01370, 2020 WL 264701, at *8 (N.D. Cal. Jan. 17, 2020) ("Sumotext has failed to establish that the asserted inconsistency described above renders Mr. Regan's opinions unreliable and thus excludable under Rule 702 and Daubert."). Defendants do not dispute Regan's qualifications to render the opinions in his report.

---

[1] Numbered exhibit references from Defendants' Declaration of Ellen Wheeler, Doc. #__, are cited as "Def. Ex. __."

**Regan's Analysis**

Regan analyzed Paris's allocation of stock purchases during two discrete time periods. *First*, Regan examined what he calls the "NFS period," from December 9, 2015, until February 10, 2019 (so called because during that period National Financial Services was Barrington's clearing broker). (Def. Ex. 1, ¶ 20.) *Second*, Regan examined Paris's allocations from February 11, 2019, through October 11, 2019—the "Wedbush period" (when Wedbush was its clearing broker). The NFS period spanned about 3.2 years—five times longer than the Wedbush period:

|  | *NFS period* | *Wedbush period* |
|---|---|---|
| *Total allocations* | 3,545 | 583 |
| *Total allocated* | $96.5 million | $13.5 million |

(*Id.*, Schedules 1.1 and 2.1.)

Regan calculated that 98% of the time Paris bought a stock *before* the market closed—with a median execution time of 12:05 p.m. But he almost always waited until *after* the market closed to allocate the trade—94% of the time. (*Id.,* p. 10.) That afforded Paris ample time to monitor the stock's performance before allocating it, either to himself or a client. The stocks Paris gave to *himself* almost always went up over the course of the day of the purchase; those he gave to his *clients* almost always went down during the day of the purchase.

Regan analyzed the "First Day Profits" for Paris's allocations—that is, the total profit or loss on the purchase on the date of the allocation.[2] This "First Day Profits" analysis focused on

---

[2] Defendants claim that Regan never explained how he calculated First Day Profits. Not so. Regan provides such an explanation in his report. (Def. Ex. 1, ¶¶ 33-35.) As he explains, a "First Day Profits" analysis excludes the profits or losses experienced after the first trading day, since a stock's performance after Paris allocated a trade is noise, not meaningful information. *Id.* The First Day Profit methodology has been accepted by courts in cherry-picking cases. (*e.g., Id.* ¶ 35, n.42; *citing SEC v. World Tree Fin.*, LLC, 43 F.4th 448, 466 (5th Cir. 2022)).

3

the profitability of the trade at the time when Paris: (a) knew whether it was profitable; and (b) allocated the trade, either to himself or a client. (*Id.* ¶ 35.)

Of the 38 months of the NFS period, Regan found that Paris's accounts realized total First Day *Profits* in 37 of those months. Client accounts, on the other hand, experienced First Day *Losses* in 37 of those months. (*Id.* ¶ 41.) Here is Regan's analysis of the overall outcomes for Paris's accounts and his clients' accounts during the *NFS period*:

|  | *Paris Accounts* | *Client Accounts* | *Total* |
|---|---|---|---|
| *Amount Purchased* | $72,786,793 | $23,732,059 | $96,518,852 |
| *First Day Profit (Loss)* | $596,382 | $(587,112) | $68,498 |
| *First Day Return Rate* | 0.8% | (2.2)% | 0.1% |

(*Id.* ¶ 34.) Here is Regan's analysis of the overall outcomes for Paris's accounts and his clients' accounts during the *Wedbush period*:

|  | *Paris Accounts* | *Client Accounts* | *Total* |
|---|---|---|---|
| *Amount Purchased* | $9,626,118 | $3,843,422 | $13,469,541 |
| *First Day Profit (Loss)* | $65,205 | $(57,310) | $7,895 |
| *First Day Return Rate* | 0.7% | (1.5)% | 0.1% |

(*Id.* ¶ 48.) Paris significantly outperformed his clients in both periods. (*Id.* ¶¶ 54-55.)

Regan didn't stop there. Beyond calculating the severe discrepancy in First Day Profits, Paris then conducted five statistical tests, none of which defendants attack in their motion. These tests established that the probability that the differences in profits and returns between Paris's personal accounts and client accounts result from random chance is close to zero:

| *Test* | *Probability As Calculated by Regan* | |
|---|---|---|
|  | NFS | Wedbush |
| **Monte Carlo Simulation**: *Probability that First Day Profits for Paris or Client Accounts was due to random chance.* | Less than 1 in 100 million. (¶ 70) | Less than 1 in 10 million. (¶ 90) |

4

| Test | Probability As Calculated by Regan | |
|---|---|---|
| **Significance Test – 2 Sample**: *Probability that the difference in the mean First Day Profit amount between Paris Accounts and Client Accounts was due to random chance.* | Less than 1 in 1 billion ($3.1 \times 10^{-53}$). (¶ 75) | Close to zero (¶ 93) |
| **Significance Test - 2 Sample**: *Probability that the difference in the mean First Day Profit return rate between Paris Accounts and Client Accounts was due to random chance.* | Less than 1 in 1 billion. (¶ 77) | Close to zero (¶ 95) |
| **Win Rate Test**: *Probability that Paris experienced a First Day Win rate (i.e., a profitable trade on Day One) exceeding the mean due to random chance.* | Less than 1 in 1 billion. (¶ 85) | Close to zero (¶ 102) |
| **Fisher's Exact Test**: *Probability that Paris and Clients experienced the number of Wins and Losses given all possible outcomes due to random chance.* | Less than 1 in 1 billion. (¶ 88) | Close to zero (¶ 104) |

(Def. Ex. 1, Section D, pp. 21-31). Defendants have not challenged the suitability of the tests Regan applied; the accuracy of Regan's calculations; or Regan's conclusions that Paris could not have achieved the success he did compared to his clients by chance.

### Regan's "First Day Performance" Analysis Is Reliable

Defendants argue that Regan's "First Day Profit" analysis is useless because he didn't differentiate between the trades Paris entered on his own accord, on the one hand, and those he executed at the direction of others. On the contrary, Regan went to great lengths to exclude from his analysis trades that Paris executed at the behest of others.

Here was his approach: *First*, Regan started with Barrington's full trading data from NFS and Wedbush.[3] (Def. Ex. 11, Excerpts from Dep. of G. Regan, 48:1-5.)

---

[3] Defendants argue that NFS's and Wedbush's trading data has not been authenticated. The SEC has attached authenticating declarations, written by NFS and Wedbush employees, among the exhibits that have been filed as part of its Rule 56.1 Statement of Additional Fact, which has been filed contemporaneously.

*Second*, Regan found—based on his review of Paris's investigative testimony and other evidence (Ex. 1 ¶ 27, fns. 34 and 35), that in addition to the accounts for which Paris acknowledged primary responsibility, Paris allocated purchases and sales from his master account, on the one hand, to accounts belonging to the Barrington Opportunity Fund or "BOF," Geoffrey Euston, Paul Polachek, Arthur and Dorothy Paris, Joanne Paris, Kellie Paris, Kari Paris and George Dettloff.

*Third*, Regan identified all allocations during the relevant timeframe that were (a) made *from* Paris's master account (for the NFS period) or Barrington's master account (for the Wedbush period); (b) *to* either Paris's personal account or one of those client accounts. (Ex. 1 ¶¶ 20-21, 28-32.)

*Fourth*, from the resulting trades, Regan excluded those the evidence established were: (a) "not made by Mr. Paris (e.g., the trade ticket refers to another trader)," (b) "made by Mr. Paris in consultation with others (e.g., other Barrington employees)" or (c) "directed by a client." (*Id.* ¶ 32.) Regan reviewed the testimony of Paris, Gary Prestopino, Nick Dempsey and other members of the BRAI trading desk, (Def. Ex. 11, 68:4-70:5; 71:20-72:7; 73:3-17), and defendants' discovery responses, (*Id.,* 64:4-12).

Despite Regan's methodical approach to culling Paris's trades, defendants are unsatisfied. They insist Regan should have excluded still *more* trades. Yet the only specific stocks/trades they can point to are from an email Alex Paris sent to Greg Paris and Nick Dempsey on December 28, 2017. (Dfs. Brief, ECF Doc. # 73, PageID #:731.) In that email, Alex Paris identifies ("off the top of my head") ten securities that are candidates for the BOF. (*See* Def. Ex. 34, Dec. 28, 2017 Email.) But Regan *did* consider this email, which caused him to exclude Paris's purchase of the

6

one such stock that Paris ultimately bought within the week that followed.[4] (Def. Ex. 11, 79:22-80:3.)

Other than that one email, defendants can't identify specific trades that Regan should have, but didn't, exclude. So as a fallback, they try to muddy the waters—essentially arguing that there's no practical way to sort out which trades are truly Paris's—particularly given the possibility that others orally asked Paris to make a trade for them. So, the argument goes, Regan's whole "First Day Return" exercise is a fool's errand.

Unfortunately for them, the evidentiary waters aren't muddy. Consider defendants' argument that "Regan assumed, despite overwhelming evidence to the contrary, that Paris was responsible for more than 99% of the BOF trades entered during the Wedbush period." (Dfs. Brief, ECF Doc. # 73, PageID #:734.) To begin with, it is important to keep in mind that this concerns 143 trades to the BOF account made during the eight-month Wedbush period—out of the thousands of trades Regan analyzed. (Def. Ex. 1, Schedule 2.7.) And defendants don't identify *any* of those trades as specifically having been Alex's or Prestipino's brainchild. And of the three BOF managers who could have been behind any given trade—Gary Prestopino, Alex Paris and Greg Paris—the testimony of the other two suggest that their involvement was minimal.[5]

---

[4] Defendants argue that Regan should have excluded two more purchases, a decision he explained during his deposition. (Def. Ex. 11, 81:25-83:13.)

[5] Prestopino testified that during the Wedbush period, "As far as I know, Greg has not executed a trade on my behalf." (See Def. Ex. 9, G. Prestopino Dep. 54:7-55:3.) Rather, during the Wedbush period, if Prestopino wanted to have a trade made for the BOF, he would have asked Alex. (*Id.*, 53:17-22.) And Alex, in turn, would have asked his brother, Greg, to make a trade in the BOF at either Alex's or Prestopino's behest. Which invites the question, how often did Alex ask Greg to make a trade in the BOF? His answer: "Not too frequently. You know, it's a longer term oriented fund and the decisions -- and we're not trading in and out 16 of the names. You know, the decision's made. As I said, the core portfolio has 20 or 25 names. So not too often." (*See* Def. Ex. 6, Alex Paris Dep. 127:11-18.).

Thus, Regan's rationale for attributing the trades he allocated to Paris was soundly based on the established evidence. To the extent that there is a theoretical possibility that a handful more trades maybe should have been excluded based on conversations that perhaps took place between Paris and others—at most, that's material for cross-examination. *See, e.g.*, *Sachell v. Khan,* No. 19 C 4597, 2022 WL 3908674, at *3 (N.D. Ill. Aug. 30, 2022) (whether there were errors in an expert's opinions "does not render her opinion unreliable. Instead, it is for the jury to weigh the conflicting evidence on that issue and make a determination.") (parentheticals omitted).

Similarly, defendants essentially complain that Regan failed to travel back in time to eavesdrop on BOF and other trading-related conversations in Barrington's offices between Paris and his colleagues. (Dfs. Brief, ECF Doc. # 73, PageID #: 731) ("Such purchases are included in Regan's analysis because, although he acknowledges that there could be verbal conversations, he makes no effort to identify trades that clients or Paris's colleagues verbally directed.") (cite omitted). For only by engaging in such time travel, defendants seem to suggest, could Regan have identified specific additional trades that Paris bought at others' behest. Moreover, the SEC expressly asked defendants to identify any specific trades that Paris entered at the request of others. They said they couldn't do so. *See* SEC's Summary Judgment Br. in Opp., pp. 17-18.

The law doesn't require Regan to engage in such feats. Particularly given the purely speculative nature of defendants' criticism. As described above, he developed and articulated a sound approach for identifying trades that Paris bought of his own accord. Sure, defendants can quibble about a few trades here or there. But as the cases above make clear, that's the stuff of cross-examination, not a *Daubert* motion.

The same can be said for Paris's newfound attempt to disclaim responsibility for trades for certain individual clients. Paris insists that a colleague, not him, made the trades for George Dettloff. But during the investigation, Paris said otherwise:

> Q: So other than the ones we've talked about…could you look through this list and tell me if there's any other accounts on this list that you made investment decisions for?
>
> A: Yes. George Dettloff I did. He's no longer an account.

*See* Def. Ex. 5, Inv. Testimony of G. Paris, 266:22 – 267:4. He said the same thing about Paul Polachek ("a long-time friend"), Geoffrey Euston ("a long, longtime friend, one of my best friends"), and Art and Dorothy Paris ("my aunt and uncle"). While he now insists he lacked decision-making responsibility for those accounts, during the SEC's investigation he owned-up to being "primarily responsible for managing" them. (*Id.,* 235:9 – 236:16.) And while Dempsey testified he managed Dettloff's account, that's a disputed fact for the jury to decide.

At trial, Paris is welcome to try walking back his sworn testimony. But he can't fault Regan for relying on his own words; nor is his newly minted story a basis to exclude Regan.

**Paris's Supposed Trading Strategies**

Defendants claim that Regan's analysis is worthless *ipse dixit* because he compares "apples and oranges," which is to say, he didn't bother considering the alternative explanation that Paris's profitable trades stemmed from a different trading strategy than the buy-and-hold approach that Paris used for his clients.

Defendants argue that Regan's analysis is useless because he didn't consider and account for such "trading strategies." Regan testified that he did look for evidence of any trading strategies that could have explained specific trading, including: the BOF offering documents describing its trading strategies, Def. Ex. 1, ¶ 10; "information in the Wells submissions that

9

articulated a trading strategy that Mr. Paris espoused," Def. Ex. 11, 33:22–34:10; and "testimony of numerous individuals, including Mr. Paris," Def. Ex. 1, ¶¶ 10, 26, and Appendix B.

Regan testified that after reviewing such evidence, he was unable to test whether any particular trade resulted from a specific strategy. Why? Because Paris himself said he was unable to connect any particular trade to any particular strategy. (Def. Ex. 11, 34:2-17.) So, Regan "look[ed] to see whether there was obvious evidence, for example, [of] a purely long-term holding strategy." (*Id.*) Regan testified that he "did not see such a clear pattern." (*Id.*) Without such a pattern, Regan "determine[d] that first day profits was in [his] view the most objective measure to perform that analysis." (*Id.*)

Regan also noted that the documentation describing the BOF strategy wasn't helpful because it articulated a *range* of strategies, including both long-term and short-term strategies. As he put it, BOF's description of its strategies is "diverse because it involves both long-term trades as well as opportunistic or short-term trading which is consistent with my recollection of Greg Paris's testimony that there were short-term opportunistic trades that were placed into the BOF including day trades." (*Id.*, 36:10-17.) Thus, the BOF had no single trading strategy.

In other words, Regan couldn't find evidence that enabled him to link specific trades to specific strategies. So he instead engaged in objective tests of the trading to determine whether any explanation—other than cherry-picking—could explain Paris's returns. As discussed above, Regan ran a battery of statistical tests using the trading data. He concluded that the probability that the differences in profits and returns between Paris's personal accounts and client accounts stem from random chance is close to zero.

He also analyzed the actual stocks Paris bought and allocated to himself, on the one hand, and to his clients. Given the Grand Canyon-sized chasm sitting between Paris's unbelievable

10

First Day Returns and his clients' pitiful First Day Returns, a fact-finder would understandably expect two very different baskets of securities.

They would be disappointed. The stocks Paris bought for himself were the very same stocks he bought for his clients—a 98% overlap for the NFS period, and a 91% overlap for the Wedbush period. Yet while he enjoyed First Day Profits trading such stocks, his clients sustained First Day Losses. The chart prepared by Regan is broken out by Paris's First Day Returns for each stock (in blue), and his clients' First Day Returns (in red):



(Def. Ex. 1, pp. 16-17.) Paris's accounts reaped total First Day *Profits* for all 30 of the securities, while his clients' accounts were allocated First Day *Losses* for 26 of the same securities. These disparate results constitute another gut punch to Paris's "different trading strategies" defense.

And then there's common sense: What kind of trading strategy could explain why Paris's clients needed to sustain First Day losses of this magnitude? Defendants fail to explain why the long-term trading strategy employed for clients repeatedly resulted in First Day losses. Even if one credits Paris's story that such a strategy existed, why did he keep using it for his clients when

11

it resulted in a First Day Win rate of just 25% during the NFS Period and 34% for the Wedbush Period—month in and month out, for years? This is especially difficult to explain given that Paris generated consistent First Day Returns for himself in the same securities. How could he be so adept at predicting when these stocks would rise over the course of the trading day for himself, but not use any of this talent to spare his clients from the horrible short-term losses they suffered?

Paris attempts some jujitsu, saying that the best evidence of his "trading strategy" defense is the very fact of his day-trading. Because that *was* his strategy, and it *wasn't* his clients' strategy. So, Paris's argument goes, comparing his realized gains from his risk-embracing day-trading, on the one hand, with his clients' buy-and-hold approach—is like comparing apples and oranges.

Of course, that ignores the evidence that Paris had his clients to thank for his success as a day trader, since the evidence shows that he made all trades in the omnibus accounts, allocated the winning trades to himself, and saddled them with the losing trades.

Still, Regan essentially took Paris up on his suggestion and compared Paris's day trades with his clients' day trades. And Regan also compared Paris's "held" trades—the trades he kept for longer than a day—with his clients' "held" trades. "Apples to apples" and "oranges to oranges," Paris might say.

The result? Still more evidence of the huge disparity between Paris's performance compared to his clients. Here is Regan's analysis on that score:

| *First Day Win Rate* | *Paris Win Rate* | *Client Win Rate* | *Overall* |
|---|---|---|---|
| *Day Trades* | 67% | 16% | 65% |
| *Held Trades* | 48% | 22% | 33% |
| *Overall* | 64% | 21% | 51% |

(Def. Ex. 1, Schedule 1.1.) That stubborn, inexplicable chasm persists between Paris's returns and his clients, even using Paris's preferred analysis.

Similarly, Regan found that the greater the First Day *Profit*, the likelier Paris was to allocate the trade to *his* account. (Def. Ex. 1, pp. 12-15.) On the other hand, the greater the First Day *Loss*, Regan found, the more likely Paris was to allocate the trade to his *clients' account*. (*Id*.) Another nail in the coffin of Paris's "different trading strategies" defense; no strategy could explain this reality—unless it was a cherry-picking strategy.

In the end, defendants are entitled to argue to the jury that Paris's trading was driven by legitimate trading strategies. They can also argue that Regan's analysis does not fully debunk their "trading defense" strategy—arguing, for example, that even if 100 million simulations couldn't come close to replicating Paris's First Day Profits, that's just because they were random allocations and thus didn't account for Paris's profit-making strategy. But the SEC, for its part, is entitled to have Regan explain to the jury why Paris's claims are unsupported by the evidence. *See SEC v. Roszak*, 495 F. Supp. 2d 875, 891 (N.D. Ill. 2007) ("There is evidence that Defendant Michel sold the Endocardial Solutions stocks at a loss; he argues that the sale was part of a short-term trading strategy… Again, Defendant Michel's explanations, and the credibility thereof, will be judged by the trier of fact."); *SEC v. Clark*, 60 F.4th 807, 815 (4th Cir. 2023) ("In reversing the district court's order, we are not suggesting Clark is liable for insider trading…. [H]e professed to have an investment strategy that explained his December 9 transactions. But to repeat, in considering a motion for a judgment as a matter of law, our task is only to decide whether there is evidence from which a reasonable jury could have decided that Clark was liable.").

**Regan's Analysis of Paris's Financial Condition**

Regan was asked to analyze Paris's bank statements from the relevant timeframe. Regan found that it was typical for Paris to withdraw money from his personal trading accounts to pay for his family's expenses and he did so fairly often. *See* Def. Ex. 4, Dep. of G. Paris, 139:10–17, 150:10–14. From January 2016 through December 2019, Paris's family expenses were $962,113, and his income from BRAI, benefits, tax refunds and other miscellaneous sources was $465,803. (Def. Ex. 1, Sched. 4.1.) During that same period, Paris withdrew $414,000 from his personal trading account at NFS and $81,300 from his personal trading account at Wedbush, which he deposited into the checking account he shared with his wife. *Id.* Paris's personal trading account was the only available source of funds to pay those expenses. (Def. Ex. 4, 145:6–9.)

Defendants argue that "Regan is simply restating facts that have been presented to him and drawing a conclusion that the trier of fact can reach for itself." (Dfs. Brief, ECF Doc. # 73 PageID #:740.) But just because Regan's cashflow analysis is simpler for a jury to grasp than his statistical tests makes it no less helpful to the jurors. *See, e.g.*, *United States v. Koen,* 982 F.2d 1101, 1116 (7th Cir. 1992) ("While the government may have been able to prove the fact of Mr. Koen's indebtedness without it, this evidence nonetheless conveyed important information relating to the nature of Mr. Koen's debts. For example, it tended to show to whom Mr. Koen owed money, on what terms, and with what prospects of repayment. As the district court remarked when ruling on the admissibility of a portion of this evidence, this information helped 'complete the picture' in the jury's mind of Mr. Koen's financial condition."); *Valentino v. Proviso Twp.*, No. 01 C 557, 2003 WL 21510329, at *2 (N.D. Ill. June 26, 2003) ("Horstman's report and testimony regarding the financial condition of the Township will also assist the trier of fact in understanding the evidence and determining a fact at issue.").

## CONCLUSION

For these reasons, the motion should be denied.

Dated: March 4, 2024

Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

By: One of Its Attorneys

/s/ Jonathan S. Polish

Jonathan S. Polish
Peter Senechalle
Attorneys for Plaintiff
**U.S. SECURITIES AND EXCHANGE COMMISSION**
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390