# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 21 cv 3450** |
| **GREGORY DAVID PARIS and BARRINGTON ASSET MANAGEMENT, INC.** | ) ) ) ) | **Judge Joan B. Gottschall** |
| **Defendants.** | ) ) ) | |
| _____ | ) | |

# PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The SEC has charged Defendants Gregory David Paris ("Paris") and Barrington Asset Management, Inc. ("BAM") with a fraudulent cherry-picking scheme. The facts set forth in the SEC's accompanying Rule 56.1(b) submissions establish that from at least December 2015 through October 2019, Paris secretly enriched himself at the expense of defendants' clients. Paris traded in an omnibus account, rather than directly in his and his clients' accounts. SAMF ¶ 1. He then waited to allocate those trades to a particular account until late in the day, allowing him to see whether the price of the stock had gone up or down. The statistical analysis by Greg Regan, one of the SEC's experts, shows a clear pattern resulting from Paris's abuse of the omnibus account. Trades Paris allocated to himself had far higher first-day returns than the trades he allocated to his clients.

The gist of defendants' summary judgment motion is captured on page two of their brief, where they declare that it is "not a disputed issue of fact" that Paris's wins and his clients' losses resulted from "different trading strategies, with different objectives and different time horizons." They argue that undisputed evidence shows that, when Paris purchased securities for his own account, he did so because he expected the value of those securities would increase in the very near term. But when Paris purchased securities for client accounts, they argue, he expected that securities purchased for clients would increase in value over the course of a year. They argue that "Regan's comparison of 'First Day' performance is essentially meaningless because Paris employed different trading strategies, with different objectives and different time horizons, when he purchased securities for his own account and for client accounts."

If it was truly undisputed that Paris's First Day Profits and his clients' First Day Losses resulted from different trading strategies, rather than Paris's cherry-picking, their motion would

be well taken. But that construes defendants' version of the facts in a light most favorable to *defendants*, all the while ignoring facts supporting the inference that Paris cherry-picked.

Consider the evidence this Court relied on to deny defendants' motion to dismiss. In its complaint, the SEC describes Paris's trading in Whiting Petroleum using an omnibus account:

- On August 20, 2019, Paris bought 3,000 shares, for $8.16 a share. Later that day he sold the stock for $8.42 a share and gave the trade to *himself*, along with the *$770 in locked in profits*.

- On August 21st, Paris bought 3,000 shares for $8.55 a share. The stock rose during the day, and that afternoon Paris sold the stock for $8.73 a share. He allocated the trade – and the *$529 in locked in profits – to himself*.

- On August 22nd, Paris bought 5,000 shares for $8.54 a share. The stock dropped over the course of the day, closing at $8.21 a share. Paris gave the trade—with its *$2,200 in unrealized losses— to the clients* in the BOF account.

- On August 23rd, Paris bought 2,500 shares for $7.55. By trading day's end, the stock had dropped to $7.03. He allocated the trade to the *BOF*, along with the *$1,300 in unrealized losses*.

- On August 26th, Paris bought 4,000 shares for $7.11 per share. The stock dropped during the trading day, closing at $6.78 per share. Paris gave the trade to his *clients*, who thus *suffered another $1,300 in unrealized losses*.

- On August 27th, Paris bought 5,000 shares for $6.68 a share. The stock rose to $6.80 by the end of the trading day, and Paris allocated the trade to *himself*, with its *unrealized profits of $615*.

Am. Complaint, ECF Doc. # 8, ¶¶ 49-54. The Court found that these trades "portray a pattern of allocating profitable trades to Paris and unprofitable ones to clients." ECF Doc. # 38, p. 13.

In its ruling, the Court also held that "Paris's failure to use trade order tickets in the broker A period [a term used in the complaint, which is also referred to in this briefing as the "NFS Period"], while representing to clients that BAM had systems in place to monitor trade allocations, can be seen as a conscious effort to avoid creating a paper trail that would expose

2

Paris's cherry-picking." *Id.,* p. 14. Back then the Court was talking about the SEC's allegations. But critically, in this Rule 56 motion, defendants dispute none of the facts this Court relied on.

Defendants' motion turns a blind eye to other critical evidence. The SEC gave Paris's trade tickets to SEC expert Gerald LaPorte, who forensically analyzed Paris's handwritten trade tickets. Along with concluding that the tickets provided no evidence that Paris allocated trades at the time he bought the stock, LaPorte found evidence consistent with Paris writing most of a trade ticket in one sitting and entering the account number in another. Yet it gets nary a mention by defendants. Another example of their wishful thinking.

Defendants do acknowledge one big piece of evidence: The statistical analysis by SEC expert Greg Regan. Among other opinions, Regan calculated that of the 38 months of the NFS Period, Paris's accounts realized total First Day *Profits* in 37 of those months. Client accounts, on the other hand, experienced First Day *Losses* in 37 of those months. Def. Ex. 1, ¶ 41.

Defendants argue that Regan's analysis is useless because it includes trades that Paris made at the behest of others. Regan analyzed *thousands* of Paris's trades. Of those, the best defendants can do is identify *ten* more trades that they claim Regan should have excluded. Well, ten trades *and* conjecture about a theoretical possibility that someone (they don't know who) may have orally asked Paris (they don't know when or where) to place a trade (they don't know which). This is all a big mystery because there is no evidence of these supposedly oral directives to Paris. No text, no email, no memo. That's not summary judgment material.

They also argue that Regan's analysis is meaningless because he fails to address the alleged difference in trading strategies. *First*, Regan testified that he did seek evidence that any of Paris's trades resulted from a trading strategy, but found none. Indeed, Paris testified that he could not link a particular trade to a specific strategy. Thus, there was nothing tangible for Regan

3

to test. *Second*, Paris's own testimony conflicts with his argument that he employed a long-term trading strategy for his clients. On the contrary, he testified that he disproportionately focused on the hedge and opportunistic strategies for his clients, and that he placed hedge trades "often." *Third*, Regan concluded that of the trades Paris allocated to his clients, only 24% during the NFS Period, and only 32% during the Wedbush Period, were profitable after the First Day. Defendants fail to explain how any long-term trading strategy required Paris's clients to achieve such dismal First Day Results.

Ultimately, the SEC's burden is to prove by a preponderance of the evidence that Paris engaged in cherry-picking. The SEC has identified evidence that does so—both at a microscopic level and based on statistical analysis. It is the jury's responsibility to weigh that evidence against Paris's self-serving testimony that his profits stemmed from a trading strategy.

If all the SEC had was many examples of Paris's suspicious trading of the same security for himself and his clients on consecutive days, it would have been enough to get its day in Court. If all the SEC had was Regan's statistical analysis, which eliminates any conceivable explanation but cherry-picking, it would have been enough. If all the SEC had was LaPorte's forensic analysis of Paris's handwritten trade tickets, it would have been enough. If all the SEC had was undisputed evidence that Paris monitored the prices of stocks after he bought them, then waited until the end of the day to allocate his trades, it would have been enough. But the SEC has this abundance of evidentiary riches. The motion should therefore be denied.

**FACTS**

A.    **Paris's Duties at BRAI**

*Management of the BOF and Individual Clients*. Defendant Greg Paris is executive vice president and chief compliance officer of Barrington Asset Management, Inc. ("BAM") an Illinois-registered investment adviser, as well as BAM's affiliated broker-dealer, Barrington Research Associates, Inc. ("BRAI"). Resp. ¶¶ 1, 2. Paris has been employed at BAM and BRAI since 1990. *Id.* ¶ 8. He runs both firms with his brother, Alex, who serves as president of BAM and BRAI. *Id.* ¶¶ 2, 3, 6.

At all relevant times, the Barrington Opportunity Fund, LP was a private investment fund with about $2.4 million in assets and a small number of investors. *Id.* ¶ 16 According to the BOF's offering documents, most of its investments would be in securities of small-cap companies that were expected to be held "longer term." *Id.*. ¶ 23. But the BOF also had two other portfolios comprised of investments that were "expected to be shorter-term in nature." *Id.*

Paris, Alex Paris and Gary Prestopino served as the BOF's portfolio managers. *Id.* ¶ 14. Each made investment decisions individually and without informing the other two managers. *Id.* ¶¶ 14, 22. Paris testified that he made such investment decisions "frequently," and it wouldn't be uncommon for him to do so weekly—potentially more often than that. *Id.* ¶ 14. According to Prestopino, "in most cases, [Paris] did not tell me what he was doing." *Id.*

Paris also managed a few client accounts that are referred to as "core accounts," as well as accounts for a few family members. *Id.* ¶ 7, 8, 12. According to BAM's Form ADV ("Brochure"), its investment strategies for client accounts were typically longer term, but it also described several short-term strategies, including investments that would be held for a year or less and investments that would be held for thirty days or less. *Id.* ¶ 17.

5

Greg Paris, Alex Paris and Nick Dempsey divided responsibility for managing the core accounts. *Id.* ¶ 8. Dempsey managed one group of core accounts with input from Alex Paris. *Id.* Paris had "primary responsibility" for the core accounts of Geoffrey Euston, Paul Polachek and Arthur and Dorothy Paris. *Id.* Paris also had "some oversight" for an account owned by George Dettloff. *Id.* ¶ 13. In addition to those core accounts, Paris managed accounts for his mother, Joanne Paris, and his cousins, Kari and Kelli Paris. *Id.* ¶ 8, 12. Paris testified that he made investment decisions for each of these accounts. *Id.*.

***Paris's Personal Trading***. Along with his other duties at BAM, Paris maintained a personal trading account to which he allocated more than 2,800 trades between December 2015 and October 2019, including 2,130 day trades. *Id.* ¶ 30. Paris bought the same securities for his personal account as for the BOF and individual client accounts he managed. SAMF ¶ 1. Paris's objective for his personal trading account was to generate short term profit; he often withdrew funds from the account to supplement his income. SAMF ¶ 5; Resp. ¶ 30. From 2016 through 2019, Paris's family expenditures were more than twice his income from his BRAI salary, benefits and other miscellaneous sources, and Paris withdrew more than $495,000 from his personal trading account to pay his family's expenses. SAMF ¶ 5.

***Duties on the Trade Desk***. Mike Hutchison is BRAI's head trader and runs the trade desk with assistance from Chris Paris. Resp. ¶ 37.The trade desk used an order management system called Mixit to enter trades and allocate them to customer and client accounts. Resp. ¶¶ 38, 53. All trades entered in Mixit were entered in an omnibus account. Resp. ¶ 51.

While Greg Paris began spending time sitting at the trade desk in December 2016, Hutchison didn't have a sense of why Paris did so. Resp.¶ 37. Hutchison and Chris Paris typically entered retail orders that came to the desk for the BOF and BAM clients; it wasn't often

they asked Paris for help entering institutional orders. Resp. ¶¶ 37, 42. Hutchison testified that Paris's's responsibilities on the trade desk involved entering orders for his own account and "one or two" retail accounts for which he was responsible. Resp. ¶ 42. Dempsey testified that he "typically" submitted his trade orders to Hutchison to enter; Prestopino testified that Paris didn't enter trade orders for him. Resp. ¶ 10, 14.

## B.    Omnibus Accounts and Allocation

Paris's typical practice was to wait until the end of the day to allocate those trades to either a client account or his personal account. Paris admitted he "sometimes" monitored the prices of those securities during the trading day. SAMF ¶ 3, 4.

From December 5, 2015 until February 10, 2019, which covers most of the period here, BRAI cleared its trades through NFS. Resp. ¶ 35. During the NFS Period, there were two ways for employees to enter trade orders. *Id*. ¶ 41. They could submit an order to the trade desk to enter via Mixit, or they could enter the order themselves using an online platform offered by NFS called "Rep Order Entry." *Id*. Likewise, BRAI maintained two omnibus accounts during the NFS period: one used by the trade desk for orders entered through Mixit, and another that was accessible in Rep Order Entry. *Id*. ¶ 51; SAMF ¶ 1. Paris entered all of his trades in the Rep Order Entry-linked omnibus account. SAMF ¶ 1. Paris was the only person who used that omnibus account. *Id.* The other BAM representatives either didn't use Rep Order Entry at all, or testified that they were unaware that an omnibus account was available on that platform. Resp. ¶ 41, 51. They were under the impression that trades entered through Rep Order Entry had to be placed directly into a personal or client account. *Id,* ¶ 51. Paris did not write trade tickets during the NFS Period or keep any documentation of his trades. SAMF ¶ 2.

On February 11, 2019, BRAI switched its clearing broker to Wedbush Securities, Inc., ("Wedbush Period"). Resp. ¶ 35. After that, all trades, including those Paris entered for himself and his clients, had to be entered through Mixit. Resp. ¶ 42. All trades during the Wedbush period were entered into a single omnibus account. Resp. ¶ 51. During the Wedbush Period, Paris began writing trade tickets for trades he entered in Mixit. *Id.* ¶ 54.

SEC accountant Pesach Glaser compared the written trade tickets that Paris completed with the data from the Mixit order management system. Glaser identified five trades for which there were no written trade tickets, seven "buy" tickets for which there were no time stamps, and sixty-one tickets that were time-stamped at least one hour (and up to seven hours) after the trade was entered. He also identified 230 trades on which the trade ticket Paris completed shows a trade for the BOF but the corresponding Client ID field in Mixit contains Paris's initials. Resp. ¶¶ 39, 40.

Paris's trading tickets were forensically examined by SEC expert Gerald LaPorte. SAMF ¶ 26. Based on that analysis, LaPorte concluded it was "highly probable" that the account numbers on some of Paris's buy tickets—rather than being written along with the rest of the buy tickets, as defendants claimed—were written at another time. SAMF ¶ 28. LaPorte further concluded it was "probable" the account numbers on some of Paris's buy tickets were written hours after they were time stamped, and contemporaneous with when Paris completed the sell tickets for the same security. *Id.* ¶ 29.

SEC expert Greg Regan engaged in a robust statistical analysis of all of Paris's trades. SAMF ¶ 6. Based on his analysis of the trading data, Regan concluded that Paris disproportionately allocated purchases that had produced "First Day Profits" to his personal accounts, and disproportionately allocated purchases that had resulted in "First Day Losses" to

client accounts. *Id.* ¶ 14. Regan further calculated the probability that the differences in profits and returns between Paris's personal accounts, on the one hand, and client accounts, resulted from random chance was close to zero. *Id.* ¶ 19.

## ARGUMENT

**Section A** (below) discusses the forensic analysis performed by SEC expert Gerald LaPorte on Paris's handwritten trade tickets. **Section B** discusses SEC expert Greg Regan's statistical analysis of Paris's trading, and addresses defendants' criticism of his analysis. **Section C** responds to defendants' "different trading strategies" argument. **Section D** addresses the last two sections of defendants' brief—about the alleged misrepresentations in Barrington's Form ADVs, and the SEC's aiding and abetting claim.

"Because cherry-picking is difficult to detect," the Fifth Circuit recently noted, "determining whether it has occurred often requires drawing inferences from a pattern of behavior, irregularities, and trading data." *SEC v. World Tree Fin., LLC*, 43 F.4th 448, 462 (5th Cir. 2022) (cleaned up).[1] That's exactly the evidence the SEC sets forth here.

Defendants fault the SEC for failing to "uncover[ ] any direct evidence of cherry-picking." Doc. # 65, p. 1. It's unclear what "direct evidence" they have in mind—short of a written confession or CCTV surveillance footage. *Cf. SEC v. Roszak*, 495 F. Supp. 2d 875, 887 (N.D. Ill. 2007) ("direct evidence is rarely available in insider trading cases, since usually the only witnesses to the exchange are the insider and the alleged tippee, neither of whom are likely to admit to liability."). And circumstantial evidence isn't a lesser form of evidence. "The reason

---

[1] The SEC establishes scienter by establishing the cherry-picking. *SEC v. RRBB Asset Mgmt., LLC*, No. 20CV12523, 2021 WL 3047081, at *3 (D.N.J. July 20, 2021) ("Cherry-picking by its nature involves knowing conduct, because such a scheme requires specific preparation and the deliberate allocation of a disproportionate number of profitable trades.") (cleaned up).

for treating circumstantial and direct evidence alike is both clear and deep rooted: Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (cite omitted).

That said, SEC expert Gerald LaPorte used electrostatic detection apparatus analysis to identify written indentations Paris made on trade tickets. *Id.* ¶ 26. LaPorte concludes that such evidence is consistent with Paris having written the account numbers from buy tickets at a different time than he wrote the rest of the tickets. *Id.* ¶ 27. In the cherry-picking context, this approaches "direct evidence."

> ### A. Gerald LaPorte's Forensic Analysis of Paris's Handwritten Trade Tickets

LaPorte served as the Secret Service's Chief Research Forensic Chemist and as the Justice Department's Director of Investigative and Forensic Sciences. *Id.* ¶ 26. LaPorte analyzed Barrington's written trade tickets using an Electrostatic Detection Apparatus or "ESDA," a common non-destructive technique to detect and visualize latent, invisible impressions on documents. *Id.*

LaPorte concluded from this analysis that 10% of Paris's trade tickets left an impression. *Id.* ¶ 27. Of those 10%, "there was still a large percentage of the remaining tickets that had impressions where the impressions weren't – they weren't sufficient. I mean, it might have been - - it might have had like an X from one of the check boxes for buy or sell… it may not have been like a sufficient amount of information[.]" *Id.* That left around a dozen tickets with useful impressions, including this "buy" ticket that Paris wrote on May 14, 2019, for 4,000 shares of Superior Industries International Inc. or "SUP":



*Id.* ¶ 31. Presumably, Paris would testify that he wrote *all* the information on this ticket at around

9:19 a.m. that morning—the timestamped time and date, the account number ("▮▮▮0010-2");

the stock's ticker symbol ("SUP"); the number of shares ("4000") and, once the trade was filled,

the price paid for each share ("$4.4358").

LaPorte found a paper with indentations from this "buy" ticket. The image on the right

(below) is the "ESDA lift," with the red arrows connecting those impressions with the same

"buy" ticket reproduced above:



*Id.* ¶ 32. The ESDA analysis of the second piece of paper reveals Paris's indentations only for:

(a) the account number and (b) the circle for "day." *Id.*

So when did Paris write that account number on the buy ticket? LaPorte offers some clues. The paper on which Paris impressed the account number was the sibling "sell" ticket for *that same trade*, which Paris timestamped at 2:54 p.m. that afternoon:



*Id.* ¶ 31.

To review: (a) Paris filled out the "account number" field of the "buy" ticket while that ticket was lying atop the corresponding "sell" ticket; yet (b) Paris wrote and timestamped that very "sell" ticket *more than five hours after* he claims to have fully completed the "buy" ticket.

The logical inference? Paris wrote only *most* of the information on the "buy" tickets in the morning. He added the *account number* to the buy ticket in the afternoon—once he learned whether it had been a profitable trade. The "buy" and "sell" tickets establish that between 9:19 a.m. and 2:54 p.m., Superior Industries' stock *went up* 18 cents. Paris bought 4,000 shares of the stock, so that 18 cents yielded a $720 *profit*. Which explains why—when Paris finished the "buy" ticket in the afternoon—he added *his* account number, allocating the *winning* trade to *himself*.

From this and the other tickets with useful impressions, LaPorte found "very strong evidence that Mr. Paris was not executing all portions of a ticket at the same time." *Id.* ¶ 27. Among those tickets, LaPorte concludes that Paris apparently wrote the account number "at a different time than he wrote the other fields on some of the Trade Tickets." *Id.* Perhaps as

12

significant are the documents on which these impressions appeared: The corresponding "sell" ticket for the same trades. *Id.* ¶ 30.[2]

Obviously, LaPorte's opinions only apply to those handful of tickets. But he was only able to identify those because there just so happened to be another ticket sitting between those buy tickets and Paris's desk. And because those were paper tickets, Barrington retained them, so they were available to LaPorte for inspection. The evidentiary stars aligned. But there's no reason to think that pattern was somehow confined to those few tickets.

### B. The Statistical Analysis of Paris's Trading Is Competent, Reliable, and Powerful.

While LaPorte analyzed the trade tickets microscopically, SEC Expert Greg Regan analyzed the trading data as a whole. Regan calculated that 98% of the time Paris bought a stock *before* the market closed, with a median execution time of 12:05 p.m. *Id.* ¶ 9. But he almost always waited until *after* the market closed to allocate the trade, 94% of the time. *Id.* That afforded Paris ample time to monitor the stock's performance before allocating it, either to himself or a client. The stocks Paris gave *himself* disproportionately went up over the course of the day of the purchase; those he gave his *clients* disproportionately went down during the day. *Id.* ¶ 14.

Regan analyzed the "First Day Profits" for Paris's allocations—that is, the total profit or loss on the purchase on the date of the allocation.[3] *Id.* ¶ 10. This "First Day Profits" analysis

---

[2] In defendants' *Daubert* motion, they argue that LaPorte's analysis of these ten to 12 paper tickets is unhelpful, since they constitute a small percentage of the hundreds of trade tickets. The SEC addresses this in its opposition to that motion. In short, a jury determines the weight to be afforded to LaPorte's conclusions. *See Gomez v. City of Chicago,* No. 13 C 05303, 2015 WL 13651138, at *3 (N.D. Ill. June 29, 2015).

[3] Defendants claim that Regan never explained how he calculated First Day Profits. Not so. Regan provides such an explanation in his report. *Id.* ¶ 10, 11. As he explains, a "First Day Profits" analysis excludes the profits or losses experienced after the first trading day, since a

focused on the profitability of the trade at a time when Paris: (a) knew whether it was profitable; and (b) allocated the trade, either to himself or a client. *Id.,* ¶ 10, 11.

Of the 38 months of the NFS period, Regan found that Paris's accounts realized total First Day *Profits* in 37 of those months. Client accounts, on the other hand, experienced First Day *Losses* in 37 of those months. *Id.* ¶ 12. Here is Regan's analysis of the overall outcomes for Paris's accounts and his clients' accounts during the *NFS period*:

| | Paris Accounts | Client Accounts |
|---|---|---|
| Amount Purchased | $72,786,793 | $23,732,059 |
| First Day Profit (Loss) | $596,382 | $(587,112) |
| First Day Return Rate | 0.8% | (2.2)% |

*Id.* ¶ 14. Here is Regan's analysis of the overall outcomes for Paris's accounts and his clients' accounts during the *Wedbush period*:

| | Paris Accounts | Client Accounts |
|---|---|---|
| Amount Purchased | $9,626,118 | $3,843,422 |
| First Day Profit (Loss) | $65,205 | $(57,310) |
| First Day Return Rate | 0.7% | (1.5)% |

*Id.* ¶ 15. Paris's accounts significantly outperformed his clients' accounts in both periods.

But Regan didn't stop there, he conducted five statistical tests, which established that Paris's disproportionate profits were statistically impossible of occurring randomly without cherry-picking:

stock's performance after Paris allocated a trade is noise, not meaningful information. *Id.* The First Day Profit methodology has been accepted by courts in cherry-picking matters. (*e.g.*, *Id.* ¶ 35, n.42; *citing SEC v. World Tree Fin.*, LLC, 43 F.4th 448, 466 (5th Cir. 2022)).

| Test | Probability As Calculated by Regan (citing Regan's Report, Section D, pp 21-31) | |
|---|---|---|
| | **NFS** | **Wedbush** |
| **Monte Carlo Simulation**: *Probability that First Day Profits for Paris or Client Accounts was due to random chance.* | Less than 1 in 100 million. (¶ 70) | Less than 1 in 10 million. (¶ 90) |
| **Significance Test – 2 Sample**: *Probability that the difference in the mean First Day Profit amount between Paris Accounts and Client Accounts was due to random chance.* | Less than 1 in 1 billion ($3.1 \times 10^{-53}$). (¶ 75) | Close to zero (¶ 93) |
| **Significance Test - 2 Sample**: *Probability that the difference in the mean First Day Profit return rate between Paris Accounts and Client Accounts was due to random chance.* | Less than 1 in 1 billion. (¶ 77) | Close to zero (¶ 95) |
| **Win Rate Test**: *Probability that Paris experienced a First Day Win (i.e., a profitable trade on Day One) exceeding the mean due to random chance.* | Less than 1 in 1 billion. (¶ 85) | Close to zero (¶ 102) |
| **Fisher's Exact Test**: *Probability that Paris and Clients experienced the number of Wins and Losses given all possible outcomes due to random chance.* | Less than 1 in 1 billion. (¶ 88) | Close to zero (¶ 104) |

*Id.* ¶¶ 19-25.

Defendants argue that because Paris's "win rate" is lower than the "win rates" of other cherry-picking defendants, the SEC's case against him is comparatively weaker. On the contrary, Regan's statistical analysis is devastating. In *World Tree*, defendants were found liable based on expert analysis that there was a one in a *million* chance that the trading was due to something other than cherry-picking. *Id.* For Paris's trading, by contrast, Regan calculated those odds at one in a *billion*. World Tree's clients had a far better Win Rate (40%) than Paris's clients (who had a net win rate of 24.2% during NFS and 32.3% during Wedbush). *Id.* ¶ 18. Perhaps more importantly, in *World Tree* the defendant's actual first day profit was within the range of

simulated profits shown in a Monte Carlo simulation. Regan's analysis determined that Paris's first day profits were more than 2.5x the maximum shown in the Monte Carlo simulation. *Id.* ¶ 20.

Defendants argue that Regan's "First Day Profit" analysis is useless because he didn't differentiate between the trades that Paris entered on his own accord, on the one hand, and the trades Paris executed at the direction of others. On the contrary, Regan went to great lengths to exclude from his analysis trades that Paris executed at the behest of others.

Here was his approach: First, Regan started with Barrington's full trading data from NFS and Wedbush.[4] *Id.* ¶ 6.

Second, Regan found—based on his review of Paris's investigative testimony and other evidence that in addition to the accounts for which Paris acknowledged primary responsibility, Paris allocated purchases and sales from his master account, on the one hand, to accounts belonging to the BOF, Geoffrey Euston, Paul Polachek, Arthur and Dorothy Paris, Joanne Paris, Kellie Paris, Kari Paris, and George Dettloff. *Id.* ¶¶ 7, 8.

Third, Regan identified all allocations during the relevant timeframe that were (a) made *from* Paris's master account (for the NFS period) or Barrington's master account (for the Wedbush period); (b) *to* either Paris's personal account or one of those nine client accounts. *Id.* ¶¶ 6, 7.

Fourth, Regan excluded from the resulting trades those that the evidence established were: (a) "not made by Mr. Paris (e.g., the trade ticket refers to another trader)," (b) "made by

---

[4] Defendants argue that NFS's and Wedbush's trading data has not been authenticated. The SEC has attached authenticating declarations, written by NFS and Wedbush employees, among the exhibits that have been filed as part of their Statement of Additional Fact. Resp. ¶ 65.

Mr. Paris in consultation with others (e.g., other Barrington employees)" or (c) "directed by a client." *Id.* ¶ 8. Regan reviewed the testimony of Paris, Gary Prestopino, Nick Dempsey and other members of the BRAI trading desk and defendants' discovery responses. *Id.*

The methodical way Regan set about to identify the proper set of trades to analyze is a far cry from the sloppiness described in a case cited by defendants, *Last Atlantis Cap. LLC v. AGS Specialist Partners*, 262 F. Supp. 3d 641, 674 (N.D. Ill. 2017) ("DeMeritt also admitted that the lists likely included orders that were not actually mishandled and likely included orders that were not even initiated by any Plaintiff in this case.").

Defendants insist Regan should have excluded still *more* trades. But to make this argument they only consider evidence that favors them, while ignoring competing evidence:

| DEFENDANTS' ARGUMENT | THE EVIDENCE THEY IGNORE |
|---|---|
| Paris was only one of three BOF managers, in addition to Gary Prestopino and Alex Paris. Paris entered trades for them too. | *Gary Prestopino* testified that, "As far as I know, Greg has not executed a trade on my behalf." Resp. ¶ 42.<br><br>*Alex Paris* was asked under oath: "How often do you initiate a trade for the BOF?" His answer? "Not too frequently," since the BOF only had a few positions, which it held over the long-term. *Id.* ¶ 45. |
| The other members of the trade desk "wanted to focus on their institutional orders" so Paris "often" entered BOF and BAM trades on the trade desk | *Hutchison* was asked under oath who was responsible for entering retail orders brought to the trade desk. He replied, "typically it would have been Chris [Paris] or I." *Id.* ¶ 37. Not Greg Paris. |
| Dempsey managed George Dettloff's account. | *Greg Paris's Investigative Testimony:*<br><br>Q: So other than the ones we've talked about…could you look through this list and tell me if there's any other accounts on this list that you made investment decisions for?<br><br>A: Yes. George Dettloff I did. He's no longer an account. *Id.* ¶ 13. |
| Paris shared responsibility for Art and Dorothy Paris's account with Dempsey. | *Paris's Wells Submission*<br><br>Paris had "primary responsibility" for managing Art and Dorothy Paris's account. *Id.* ¶ 8 |

At best, these are disputed facts for a jury to sort out.

Along the same lines, defendants argue that Regan made "no attempt to exclude trades where directions were provided verbally to Paris," including when Paris was "one of only three individuals with access to Mixit." Doc. # 65 p. 19. In this respect, defendants are projecting. For they are the ones who made "no attempt to exclude trades where directions were provided verbally to Paris." The SEC propounded an interrogatory, asking Paris to "Identify all trade orders that you entered for BAM Clients other than Paul Polachek, Geoffrey Euston and Arthur and Dorothy Paris, including any orders you entered at the direction of the client or the advisor primarily responsible for the account." Paris dismissed it as an improper inquiry and stated that, in any event, he didn't know:

> Paris objects to Interrogatory No. 16 on grounds that it is overbroad, unduly burdensome, and is not proportional to the needs of the case. Subject to and without waiving his objections, Paris states he lacks sufficient information to identify orders that he placed on behalf of BAM Clients other than Paul Polachek, Geoffrey Euston and Arthur and Dorothy Paris.

Resp. ¶ 14. Along the same lines, when Paris was asked to provide representative examples of the trades he made to the BOF that were "opportunistic trades," he complained: "It is difficult, given the passage of time and the volume of trading, to definitively identify a particular purchase of a security as intended to be part of the opportunistic portfolio, as opposed to the Core portfolio or the Hedge Portfolio." *Id.* ¶ 20. His testimony similarly reflected an inability to identify any trades that Paris made at the oral request of a client or colleague. *Id.* ¶¶ 45-50.

Moreover, there are some securities that the evidence establishes only Greg Paris—and no one else at Barrington—traded. So for these securities, there is no issue about whether he bought the stocks on his own initiative or because someone else asked him to. And Paris bought the stock both for himself and for his clients. So what do Paris's trading pattern in these stocks tell us? They are consistent with a trader who engaged in cherry-picking. Two examples:

*NUGT*. Take his trading in a security called "Direxion Daily Gold Miners Index Bull 2X Shares" or "NUGT." Regan compared the First Day Profit or Loss for the Paris Accounts to Client Accounts for NUGT buys during the NFS Period:

| All Purchases | Paris Accounts | Client Accounts |
|---|---|---|
| Total Purchase Amount | $9,832,488 | $2,295,174 |
| Total First Day Profit (Loss) | $61,683 | ($100,221) |
| Mean First Day Profit (Loss) | $244 | ($2,523) |
| First Day Return Rate | 0.6% | -4.4% |
| No. of Purchases | 282 | 43 |
| No. of Wins | 162 | 2 |
| Win Rate | 57% | 5% |

SAMF ¶ 25. The NUGT trades reflected the same disparate First Day Returns as Paris's allocations for all securities.

*TVIX*. Another example is a security called "VelocityShares Daily 2x VIX Short-Term ETN" or "TVIX." Regan compared the First Day Profit or Loss for the Paris Accounts to Client Accounts for TVIX buys:

| All Purchases | Paris Accounts | Client Accounts |
|---|---|---|
| Total Purchase Amount | $21,707,979 | $1,285,444 |
| Total First Day Profit (Loss) | $50,700 | ($52,213) |
| Mean First Day Profit (Loss) | $230 | ($618) |
| First Day Return Rate | 0.2% | -4.1% |
| No. of Purchases | 421 | 40 |
| No. of Wins | 215 | 3 |
| Win Rate | 51% | 8% |

*Id.* Again, this is the same pattern Regan found for Paris's overall trading. Regan's analysis of Paris's trading is reliable, admissible, and constitutes a slew of disputed facts and genuine issues that preclude summary judgment.

**C.**     **It is The Jury's Job To Weigh The Evidence Of**
          **Paris's Cherry-Picking Against His Claimed**
          **Reliance On Legitimate Trading Strategies.**

Insider trading defendants routinely claim that their trading stemmed from a specific trading strategy rather than inside information. Courts have uniformly left that for the jury to decide. In *Roszak*, for instance, the defendant moved for summary judgment, arguing that the trade at issue was part of "a short-term trading strategy," and that he likely sold the stock "to prevent further erosion of the profits that he had made on prior trades." *Id.,* 495 F. Supp. 2d at 891. The Court denied the motion, holding that "Defendant Michel's explanations, and the credibility thereof, will be judged by the trier of fact." *Id. See also SEC v. Clark,* 60 F.4th 807, 815 (4th Cir. 2023) ("In reversing the district court's order, we are not suggesting Clark is liable for insider trading. [Clark] professed to have an investment strategy that explained his December 9 transactions. But to repeat, in considering a motion for a judgment as a matter of law, our task is only to decide whether there is evidence from which a reasonable jury could have decided that Clark was liable."); *SEC v. Singer*, 786 F. Supp. 1158, 1172 (S.D.N.Y. 1992) (denying summary judgment for a defendant who claimed that his trade was part of his "averaging down" strategy, given "sufficient evidence in the record for a jury to find that the non-public information which Singer possessed was material").

Paris makes the same kind of "trading strategy" defense. But this defense doesn't align with his actual trading. Take his trading in Whiting Petroleum, discussed on page one of this brief, when considered alongside his purported trading strategies. Paris wants this Court to believe that these two things are both indisputably true:

- The morning of August 21, 2019, he bought the stock for himself at $8.55 a share "with the expectation or hope that the securities he purchased would increase in value in the near term – typically in the next day or two," SAMF ¶ 34; Resp. ¶ 29; and

- The next morning he bought the same stock for his clients—for a penny more—"with the expectation of holding them long-term periods (i.e., a year or more) and not seeking short term profits or day trading," SAMF ¶ 20; Resp. ¶ 20.

It's hard to conceive of a fact or issue that is more hotly disputed than this narrative. And there's nothing unique or special about these two trades. The same incoherence is manifested in virtually every stock Paris bought for himself and his clients on consecutive days.

And then there's common sense: What kind of trading strategy could explain consistent, persistent First Day losses of the magnitude suffered by Paris's clients? And even if one credits Paris's story, why did he keep using a strategy for his clients that resulted in a net First Day Win rate of just 24.2% during the NFS Period and 32.3% for the Wedbush Period—month in and month out, for years? SAMF ¶ 18. He offers no evidence why any long-term strategy required such losses. This is especially difficult to explain given that Paris generated consistent First Day Returns for himself in the same securities. How could he be so adept at predicting when these stocks would rise over the course of trading day for himself, but not use any of this talent to spare his clients from the horrible short-term losses they suffered?

Defendants argue that Regan's analysis is useless because he didn't consider such "trading strategies." Regan testified that he did look for evidence of any trading strategies that could have explained specific trading, including the BOF offering documents describing its trading strategies, "information in the Wells submissions that articulated a trading strategy that Mr. Paris espoused," and "testimony of numerous individuals, including Mr. Paris." Resp. ¶ 72.

Regan testified that after reviewing such evidence, he could not test whether any particular trade resulted from a specific strategy because Paris testified to being unable to

connect any particular trade to any particular strategy. *Id.* Regan "look[ed] to see whether there was obvious evidence, for example, [of] a purely long-term holding strategy." *Id.* Regan testified that he "did not see such a clear pattern." *Id.* Without any such a clear pattern or testimony by Paris about whether any trade was made employing a particular strategy, Regan testified that he set about "to look at the totality of trades that were not excluded trades," which is to say, to look at trades that Paris made on his own initiative. His analysis of all such trades included "implement[ing] a methodology to test the trading strategy[.]" *Id.* He determined "that first day profits was in my view the most objective measure to perform that analysis." *Id.*

Regan also noted that the documentation describing the BOF strategy wasn't helpful because it articulated a range of strategies, including both long-term and short-term strategies. *Id.* Thus, there was no single trading strategy for the BOF that Regan could test. Instead, he engaged in objective tests of the trading to determine whether any explanation —other than cherry-picking—could explain Paris's returns.

That's why he performed a Monte Carlo simulation. "A Monte Carlo simulation involves repeated random sampling of various potential scenarios to compute an average result." *Advanced Analytics, Inc. v. Citigroup Glob. Markets, Inc.*, No. 04CV3531, 2019 WL 9466011, at *2 (S.D.N.Y. Sept. 4, 2019). Regan picked purchases at random from the total population of Paris's stock purchases (either for himself or a client) during the NFS period, until the total security purchase amount approached the actual amount Paris invested. SAMF ¶ 20. He then repeated this process 100 million times to obtain a distribution of possible First Day Profits based on randomly selected allocations. *Id.*

What happened when the smoke cleared, after the last of those 100 million simulations were run? Not one so much as *approached* Paris's actual First Day Profit. Paris's First Day

Profits were more than twice that of the absolute most profitable simulation—of the 100 million simulations run. While the mean simulated First Day Return was $51,669, Paris's First Day Return was more than *tenfold that amount*. Similarly, the actual First Day Loss experienced by client accounts was more than three times worse than the simulation with the greatest First Day Loss—again, of the 100 million simulations run. SAMF ¶ 20. This result provides strong evidence that the only cogent explanation for Paris's First Day Profits is cherry-picking.

This is all the more true since the stocks Paris bought for himself were the very same stocks he bought for his clients—a 98% overlap for the NFS period, and a 91% overlap for the Wedbush period. Yet Regan found that while Paris enjoyed First Day *Profits* trading the same stocks as his clients, they sustained First Day *Losses*. This chart is broken out by Paris's First Day Returns for each stock (in blue), and his clients' First Day Returns (in red).



SAMF ¶ 16. Paris's accounts reaped total First Day *Profits* for all 30 of the securities, while client accounts were allocated First Day *Losses* for 26 of the same securities. These disparate results constitute another gut punch to Paris's "different trading strategies" defense.[5]

---

[5] The SEC's focus here is on the *disparate First Day Results* of the trading in the same securities, not just that he bought the same securities for himself and his clients. *Cf. SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 172 (D.R.I. 2004) ("The Commission argues that the Defendants'

Defendants say that Regan's "First Day Returns" analysis is misguided, because it compares "apples to oranges," the "apples" being Paris's day trades and the "oranges" being his clients' multiday trades. But Regan also compared Paris's day trades with his clients' day trades. And he compared Paris's multiday trades with his clients' multiday trades. "Apples to apples" and "oranges to oranges," Paris might say.

The result? Still more evidence of the huge disparity between Paris's performance compared to his clients. He found that for day trades, Paris's First Day Win Rate was 67% while his clients' was 16%. For multiday trades, Paris's First Day Win Rate was 48%, while his clients' was 21%. SAMF ¶ 17. That stubborn, inexplicable chasm persists between Paris's returns and his clients, even using Paris's preferred analysis.

Just because Paris says he had some sort of "short term" strategy does not make it so. That's *his* story, but the jury will need to weigh it against the evidence that his overriding strategy was cherry-picking. In the end, defendants are entitled to argue to the jury that Paris's trading was driven by legitimate trading strategies. They can also argue that Regan's analysis does not fully debunk their "trading defense" strategy—arguing, for example, that even if 100 million simulations couldn't come close to replicating Paris's First Day Profits, that's just because those were random allocations and thus didn't account for Paris's profit-making strategy. *See, e.g.*, *Roszak*, 495 F. Supp. 2d at 891 ("Defendant Michel's explanations, and the credibility thereof, will be judged by the trier of fact."). The jury will need to weigh the credibility of this vague strategy defense against the SEC's powerful evidence of the absence of any legitimate strategy.

---

practice of purchasing a security for the firm and then later purchasing the same security for clients is evidence of cherry picking.").

D.     **The Misrepresentations Claim and Aiding-and-
       Abetting Claim Should Be Tried To A Jury.**

Defendants argue that because Paris didn't cherry-pick, the statements in the BAM's

Forms ADV were not inaccurate. As established above, whether Paris engaged in cherry-picking

is a hotly disputed issue. Defendants also argue that the representations in the Form ADV, that

"no person employed by the firm shall prefer his or her own interest to that of an advisory client"

and that "[e]mployee trading is reviewed on a regular basis" was not false because *Paris wasn't

an employee.* Doc. # 65 p. 25. That's a peculiar claim for defendants to make in a brief that

*begins*: "The [SEC] accuses Gregory Paris, *an employee of an investment advisor, Barrington

Asset Management, Inc. ("BAM")*, of 'cherry picking.'" *Id.,* p. 1 (emphasis added). That's

consistent with BAM's Form ADV, which describes Paris as "employed by" BAM. Resp. ¶ 8.

While defendants also assert that there is "indisputable evidence" that employee trading

was reviewed in several ways, both Paris and his brother, Alex, admitted that no one, other than

Paris himself, was designated to review his trading. Resp. ¶ 33, 59. And even Paris admitted that

an "odd question" to ask if he reviewed his own trades: "I mean . . . do I have an internal

discussion with myself? No. . . . I just know that I wasn't disadvantaging a client." *Id.* ¶ 59.

The same factual disputes that compel denial of summary judgment on the primary

cherry-picking claim also compel denial of summary judgment on the SEC's aiding-and-abetting

claim. *SEC v. Johnson*, 530 F. Supp. 2d 307, 315 (D.D.C. 2008) (reasons for denying summary

judgment on primary claims justify denial of summary judgment on aiding and abetting claim).

**CONCLUSION**

A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Jones v. DuPage Cnty. Sheriff's Off*., 529 F. Supp. 3d 867, 872 (N.D. Ill. 2021). At summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (cite omitted). The court therefore considers the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences from that evidence in favor of the party opposing summary judgment. *Id.*

Defendants' motion flouts these hard-and-fast rules by ignoring LaPorte's analysis in their motion.[6] And defendants attack Regan's statistical analysis by cherry-picking bits and pieces of evidence and inferences. That's not how Rule 56 works. As Judge Dow held while denying a similarly problematic motion for summary judgment, in terms that apply equally here:

> To see the case that way would require the Court to completely credit Defendants' testimony and ignore any other circumstantial evidence. But it is Defendants who have moved for summary judgment, and so it is the SEC, not Defendants, that is entitled to a favorable view of the evidence and to have reasonable inferences drawn in its favor.

*SEC v. Berrettini*, No. 10-CV-01614, 2012 WL 5557993, at *9 (N.D. Ill. Nov. 15, 2012). This Court should follow suit and deny defendants' motion for summary judgment.

---

[6] Perhaps defendants have decided to lay in wait until their reply brief to first address this evidence. That would be unfair. *See Oats v. McHenry Cnty*., No. 3:22-CV-50113, 2023 WL 8787792, at *2 (N.D. Ill. Dec. 19, 2023) ("But Defendants did not seek dismissal of the First Amendment claim in their motion to dismiss or the memorandum in support. Oats noted this omission in his response brief. Unsurprisingly, only then did Defendants attack this claim for the first time in the reply brief. But movants cannot raise new issues for the first time in their reply briefs; doing so is dirty pool.").

26

Dated: March 4, 2024

Respectfully submitted,

**UNITED STATES SECURITIES AND
EXCHANGE COMMISSION**
By: One of Its Attorneys
/s/ Jonathan S. Polish

Jonathan S. Polish
Peter Senechalle
Attorneys for Plaintiff
**U.S. SECURITIES AND
EXCHANGE COMMISSION**
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390