## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| United States Securities and Exchange Commission, | ) ) | |
| Plaintiff, | ) ) | Case No. 21-CV-3450 |
| v. | ) ) | Judge Joan B. Gottschall |
| Gregory David Paris and Barrington Asset Management, Inc., | ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this civil enforcement action, the United States Securities and Exchange Commission ("SEC") accuses defendant Gregory (sometimes "Greg") D. Paris ("Paris") of engaging in a practice commonly referred to as cherry-picking between 2015 and 2019. *See* Pl. Resp. to Defs.' Stmt. Undisp. Facts ("Resp. to SUF") ¶ 62, ECF No. 86. As the term is used in this litigation, cherry-picking occurs "when an investment adviser defrauds his clients by purchasing stock and then waiting to see whether the price of the stock goes up, or down, before allocating the trade" to either a favored account, here Paris's personal trading account, if the trade turns a profit, or to the client if the trade nets a loss. *See* Am. Compl. ¶ 2, ECF No. 8. The SEC's theory is that Paris cherry-picked by trading in a stock during the day and waiting until the end of the trading day to see how it performed. Depending on the stock's performance, Paris would then allegedly allocate the trades placed earlier in the day (or in some instances the prior day) to himself or a client.

Paris and his employer, co-defendant Barrington Asset Management, Inc. ("BAM"), move for summary judgment. ECF No. 66. They have also filed separate motions to exclude the opinions and testimony of the SEC's three expert witnesses as unreliable and therefore inadmissible under Federal Rule of Evidence 702. Mots. to Exclude, ECF Nos. 68, 70, 72. Without the experts' opinions and testimony, defendants maintain that no reasonable jury could find that cherry-picking occurred. *See, e.g.*, Defs.' Mem. Supp. Mot. Summ. J. 1–3, ECF No. 67.

For the following reasons, the court denies defendants' motion for summary judgment and rules as follows on defendants' motions to exclude expert opinions and testimony.

## I. Summary Judgment Standard

When a summary judgment motion is filed, "the court has one task and one task only: to decide . . . whether there is any material dispute of fact that requires a trial." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (alterations in original) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)); *see* Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, "facts must be viewed in the light most favorable to," and all reasonable inferences from the evidence must be drawn in favor of, the nonmoving party—but "only if there is a genuine dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quotation omitted).

After a properly supported motion for summary judgment is made, the adverse party must go beyond the pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250 (quotation omitted). Thus, summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## II. Factual Background

Except where stated otherwise, the following facts are undisputed. Consistent with the summary judgment standard, the court recites the facts in the light most favorable to the SEC.

### A. The Parties and Paris's Role

Defendant BAM, an investment advisory firm, is affiliated with non-party Barrington Research Associates, Inc. ("BRAI"), a registered broker-dealer founded more than 40 years ago by Paris's late father. *See* Resp. to SUF ¶¶ 1–3. BRAI sells research on small-cap companies to institutional investors, who in turn send brokerage business to BRAI. *Id.* ¶ 4. Founded in 1986,

"BAM is a much smaller operation than BRAI with approximately 45 clients and, as of December 31, 2015, less than $60 million in assets." *Id.* ¶ 5.

Paris has worked full-time for BRAI since 1996. *Id.* ¶ 2. He presently serves as Executive Vice President and Compliance Officer of BAM and BRAI. *Id.* The parties agree that Paris's duties during the relevant time period included overseeing compliance matters, though there is a genuine dispute concerning whether he spent the majority of his time on compliance. *See id.* ¶ 6. Regardless, it is undisputed that Paris was involved in the management of the investment accounts of certain clients. *See id.* ¶¶ 7, 9–13. Paris also co-managed the Barrington Opportunity Fund, L.P. ("BOF"), a relatively small fund (approximately $2.1 million in assets) created to capitalize on BRAI's research expertise. *See id.* ¶¶ 14–16.

The extent of Paris's involvement in the management of BOF's trading activities as well as the extent of his personal involvement in trading in client accounts is the subject of multiple genuine disputes. Viewing the evidence in the light most favorable to the SEC, a jury could find that Paris personally served as the primary point of contact for certain BAM "core clients," that he personally placed trades in those clients' accounts, that he sometimes traded in accounts owned by his relatives, and that he personally placed trades on behalf of BOF without consulting his co-managers. *See id.* ¶¶ 12, 15–16, 22. There is no dispute that Paris placed trades on behalf of BOF, but there is a genuine dispute over which trades Paris and his colleagues placed. *See id.*

Defendants contend that there is no dispute that they employed a long-term strategy when they traded on behalf of clients, including BOF, while Paris employed a short-term strategy when he traded in his personal account. *See id.* ¶¶ 17–20, 23–26, 28–32. In support, defendants cite statements in BAM's Form ADV, a disclosure form all investment advisors are required to complete. *See id.* ¶¶ 23–26. The Form ADV included representations that BAM would be managed by long-term investors with a horizon of one or more years. *See id.* For instance: "Our investment strategies are typically longer-term oriented. However, holding periods are largely driven by the time it takes for an investment to move from undervalued to fairly valued in our opinion . . . ." Form ADV 8, Def.'s Ex. 22, ECF 75-1. Whether those written statements

3

accurately reflect what occurred is disputed. A reasonable jury viewing the disputed evidence favorably to the SEC would be justified in finding that Paris and other traders sometimes deviated from a long-term trading strategy. *See* Resp. to SUF ¶¶ 16–20. Indeed, it is undisputed (defendants' fact) that "there were instances where a BAM advisor engaged in shorter term trading." *Id.* ¶ 21. Considering the summary judgment evidence as a whole, what strategy was used for any given trade is genuinely disputed, and must be found by a jury.

### B. Trading Practices

BRAI used two different clearing firms to place trades during the relevant time period. *See id.* ¶ 35. Between December 9, 2015, and February 10, 2019, BRAI placed trades through National Financial Services ("NFS"); the parties refer to this as the "NFS period." *Id.* For reasons unrelated to this litigation, BRAI switched to Wedbush Securities, Inc. ("Wedbush") in February 2019. The "Wedbush period" spans February 11, 2019–October 19, 2019. *See id.*

BRAI trading desk personnel, including Paris, used software called "Mixit" to place trades during the NFS and Wedbush periods. *Id.* ¶ 38. "BRAI required that for all orders entered in Mixit, a paper ticket with basic information about the order be completed, including the account number and/or name of the client for whom the trade is intended." *Id.* ¶ 39. The tickets were generally time stamped at or around the time an order was received. *See id.* The SEC contends that Paris sometimes backdated his trading tickets in order to cherry-pick trades.

Paris and two other employees had access to Mixit, and during the NFS period, other BRAI employees could trade online using a separate system provided by NFS. *See* Resp. to SUF ¶ 41. Wedbush did not have an equivalent online system. *Id.* ¶¶ 41–42. So during the Wedbush period, BRAI personnel had to ask one of their three colleagues with Mixit access to place trades. *See id.* ¶ 42.

During the NFS period, BRAI traded using two omnibus accounts, one of which is at issue here (account number GBT-000015). *See* Pl. Resp. to Def. Stmt. Add'l Facts ("Resp. to SAF") ¶ 1, ECF No. 102. "[F]or trades he entered into and allocated from the GBT-000015 account, Paris did not prepare trade tickets or maintain the handwritten notes he prepared during

4

the course of the day regarding trades," such as notes on allocating trades to himself and clients. *Id.* ¶ 2 (undisputed fact). According to the SEC, this facilitated the alleged cherry-picking. Paris monitored intra-day stock prices on his computer. *Id.* ¶ 4. A reasonable jury could find that he had an opportunity to reallocate trades to himself or to a client, depending on how a particular stock performed during the day. *See id.* ¶¶ 2–4, 7.

During the Wedbush period, all trades entered in Mixit (and therefore, entered during this period) "were placed in what is referred to as an 'omnibus' or 'average price account.'" Resp. to SUF ¶ 51. The omnibus account "served multiple purposes, including allowing BRAI to generate a single trading confirmation for its large institutional clients." *Id.* ¶ 52. "After entering trades in the omnibus account, the trade desk would then later allocate the trades to the appropriate [client] account." *Id.* ¶ 53. "It was not unusual" for trades to be allocated after the market closed. *Id.* Paris testified that he "usually" allocated trades at the end of the trading day.[1] Paris Dep. 109:18–24 (Dec. 19, 2019).

### C. The SEC's Claims and BRAI's Form ADV

The SEC brings claims under §§ 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3); § 10(b) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. § 77j(b); Rule 10b-5 (promulgated under the Exchange Act, 17 C.F.R. § 2410.10(b)(5)); and §§ 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1) and 80b-6(2). In count III of the amended complaint, the SEC alleges that defendants violated §§ 206(1) and 206(2) of the Advisers Act in that they breached their fiduciary duties to their clients through the alleged cherry-picking scheme and by making false or misleading statements in BAM's Form ADV. Am. Compl. 20–21. The SEC brings count IV against Paris only and in the alternative to count III under the same sections of the Advisers Act. *See id.* at 21. The SEC alleges that Paris aided and abetted BAM's violations

---

[1] Regarding the subject of Paris's trade allocation practices, the SEC cites page 313 of the "Paris deposition." *See* Resp. to SUF ¶ 53. The two Paris deposition transcripts in the record (one of Gregory Paris and one of Alexander Paris, Jr.) consist of 158 and 111 pages respectively. The court therefore disregards the SEC's citation to page 313.

of the Advisers Act "by engaging in the cherry-picking scheme discussed above, and by making materially misleading statements in BAM's [Form ADV]." *Id.* ¶ 90. The SEC alleges that the following representations in the Form ADV were false or misleading:

> Our Code of Ethics is designed to assure that the personal securities transactions, activities and interests of our employees will not interfere with (i) making decisions in the best interest of advisory clients and (ii) implementing such decisions while, at the same time, allowing employees to invest for their own accounts. Our firm and/or individuals associated with our firm may buy or sell for their personal accounts securities identical to or different from those recommended to our clients. In addition, any related person(s) may have an interest or position in a certain security(ies) which may also be recommended to a client. However, it is the expressed policy of our firm that no person employed by the firm shall prefer his or her own interest to that of an advisory client, nor purchase or sell any security prior to a transaction(s) being implemented for an advisory account, thereby preventing such employee(s) from benefiting from transactions placed on behalf of advisory accounts. Employees are required to notify Barrington of all employee-related investments accounts and provide duplicate statements and confirmations for all such accounts. Employee trading is reviewed on a regular basis. Barrington requires employees to receive prior approval from Barrington before investing in any initial public offerings or private placements.

Barrington Asset Management Firm Brochure (March 31, 2016) at 12, ECF 75-1.

### III. Expert Reports and Opinions

Defendants have filed three motions to exclude expert testimony, one motion for each SEC expert. *See* ECF Nos. 68, 70, 72. In opposing summary judgment, the SEC cites the reports and deposition testimony of two of those experts, Gregory J. Regan and Gerald Laporte. *See* Pl. SAF ¶¶ 6–32, ECF No. 87. A summary of each expert's opinions follows.

### A. Gregory J. Regan

To prove that cherry-picking occurred, the SEC relies principally on the expert report of Gregory J. Regan ("Regan"). *See* SAF ¶¶ 6–25; Regan Report, ECF No. 107. A licensed Certified Public Accountant, Regan is a Certified Examiner of Questioned Documents, and he holds a certification from the American Institute of Certified Public Accountants designating him as being certified in financial forensics. Regan Report 2. He has worked at a major accounting firm, served as the controller of a publicly traded company, and has published articles on financial forensics topics. *See id.* & App. A (publications listed in appendix).

6

Regan analyzed two spreadsheets, one produced by NFS and one produced by Wedbush. Collectively, the spreadsheets contained data on BRAI's trades during the relevant time period. Resp. to SAF ¶ 6 (citing Regan Report ¶¶ 30–32). Regan narrowed his focus to trades allocated in "(a) the omnibus account used by Paris during the NFS Period, GBT-000015; or (b) the omnibus account into which all trades were entered during the Wedbush Period." *Id.* ¶¶ 6–7 (citing Regan Report ¶¶ 30–31). He analyzed all allocations made between Paris's personal account on the one hand and one of the nine clients, including BOF, with which Paris was involved. *See id.* Regan excluded trades he did not believe were attributable to Paris, either because a trading ticket or other evidence indicated that another trader placed the trade, the trade was made at a client's direction, or the trade was placed in consultation with other traders. Regan Report ¶ 32. Regan testified at his deposition that he made his "best efforts" not to include trades not allocated by Paris, based on documentary evidence, such as email messages, produced in discovery showing that another BRAI staff member directed the trade. *See* Resp. to SUF ¶ 69 (quoting Regan Dep. 59:5–19).

As defendants argue, Regan made an assumption at this point about the trades for which he had no specific evidence, namely that Paris, rather than another BRAI staff member, placed the trade. *See id.* ¶¶ 68–69; Resp. to SAF ¶ 8. Depending on the inferences a jury chooses to draw from the disputed facts surrounding other BRAI employees' access to place trades, Regan's assumption may create some doubt about his analysis because other BRAI employees' may have placed some of the trades Regan attributed to Paris. *See* Resp. To SUF ¶¶ 68–69; Resp. to SAF ¶ 8.

Regan analyzed the "First Day" performance of Paris's purported trades. *See* Resp. to SAF ¶ 10 (citing Regan Report ¶ 33). He defined a "First Day Profit or First Day Win as a trade for which the sale price (if a day trade) or the day's closing price was higher than the purchase price." Regan Report ¶ 33. Regan defined "First Day Loss" and "First Day return rate" with reference to the same criteria. *See id.* He focused on First Day results because Paris testified that he often allocated trades at the end of the trading day, so if Paris was cherry-picking, he

would presumably be able to execute his scheme by allocating same-day trades once he knew how the stock had performed. *See* Resp. to SAF ¶ 11. Regan opined that Paris realized total First Day profits in 37 of the 38 months in the NFS period while his clients realized total First Day losses in 37 of 38 months. *See id.* ¶ 12 (citing Regan Report ¶ 41). According to Regan's calculations, during the NFS period, Paris realized $596,382 in First Day profits allocated to himself, and his clients lost $527,884. *Id.* ¶ 14 (citing Regan Report ¶ 34 & Sched. 1.8.2). During the Wedbush period, Regan's analysis shows that trades allocated to Paris's personal account realized $57,310 in First Day profits while his clients were allocated $7,895 in First Day profits, meaning that 87.89% of First Day profits were allocated to Paris. *See id.* ¶ 15 (citing Regan Report ¶ 45 & Sched. 2.1).

At the final step of his analysis, Regan performed four tests to analyze the probability that the "performance differences" he found are the "result of random chance." Regan Report ¶ 66. For instance, Regan conducted a Monte Carlo simulation, which "is a commonly used tool to analyze outcomes" that "involves the generation of random simulations, each representing a possible outcome of some process." *Id.* ¶ 67. Regan ran one hundred million simulations and produced a randomized distribution of allocations of First Day profits and losses between Paris and his clients. *Id.* ¶ 69. Paris's actual First Day profits "were more than 2.5x the maximum simulated First Day Profits," and "actual First Day Losses for Client Accounts were nearly 3x the worst simulated outcome." *Id.* ¶ 70. Based on the Monte Carlo test, Regan opines that the odds "that the First Day Loss for the Client Accounts was due to random chance [were] less than 1/100 million." Resp. to SAF ¶ 20 (citing Regan Report ¶ 70). The other statistical tests Regan performed produced similar results. *See* Resp. to SAF ¶¶ 21–25; Regan Report ¶¶ 74–88. In sum, Regan opines that the probability that the performance differences he observed resulted from random chance "is close to zero." Regan Report ¶ 66.

Finally, Regan opines that Paris's trading profits allowed him to meet his personal financial obligations. *See id.* ¶¶ 145–47. Regan reviewed Paris's income tax returns and bank statements for 2015–19 to assess his income and expenses. *Id.* ¶ 147. He concluded that Paris's

expenses exceeded his salary by approximately $700,000. *See id.* ¶ 146. Paris made up the difference by withdrawing funds from his personal trading accounts, according to Regan's analysis. *See id.* ¶¶ 146–47.

### B. Gerald Laporte

The SEC also relies at summary judgment on the expert report of Gerald LaPorte ("LaPorte"), former Chief Research Forensic Chemist for the Forensic Services Division of the U.S. Secret Service. *See* LaPorte Report ¶¶ 1–17, ECF No. 54-1. LaPorte has more than 20 years of experience as a forensic chemist examining documents to determine how they were produced, their origin, and their authenticity. *See id.* ¶ 3. He has published scholarly articles and textbook chapters on forensic document examination, and he has served in a variety of investigative roles with the government, including with the Justice Department, the Secret Service, and the Office of Science and Technology Policy within the Executive Office of the United States President. *See id.* ¶¶ 5–15.

LaPorte analyzed 2,630 of Paris's trade tickets, as well as other paper documents, dated in the following months: February 2016, January 2017, and February–October 2019. *See id.* ¶¶ 18–20. He examined the tickets using visual, microscopic, optical, and chemical examination techniques, as well as through an Electrostatic Detection Apparatus ("ESDA"). *See id.* ¶¶ 27–39. His visual and microscopic examinations were inconclusive. *See id.* ¶ 44. Based on those examinations, LaPorte wrote that it was "not possible to accurately or reliably determine whether the written account numbers [on the trade tickets] were executed before or after the timestamp was applied." *Id.*

LaPorte also examined the tickets for "potential impressions." *See id.* ¶¶ 30–31. As explained in LaPorte's report, when a person writes on a piece of paper, the writing sometimes leaves an impression on paper underneath it—written impressions can sometimes be detected on as many as five pages stacked beneath a piece of paper. *Id.* ¶ 30. "The indented writing, or resulting impressions, can be vital when attempting to determine if the writing on multiple documents was executed contemporaneously with other entries." *Id.* The ESDA examination

9

process involves using a wand to pass a high-voltage electrical charge through a document. *Id.* ¶ 32. The examiner then covers the document with specialized glass beads coated with toner. *Id.* Because the document is electrically charged, the toner "fills in the impressed areas of the document." *Id.*

LaPorte examined 1,132 trading tickets "apparently written by Paris" using the ESDA process. *See* Letter from J. Polish to E. Wheeler at 2 (Sept. 21, 2023), ECF No. 75-1, Ex. 21. More than ninety percent of the examined tickets did not yield any useable writing impressions. *Id.* After describing his review of those tickets with useable impressions, LaPorte wrote: "[T]here is very strong evidence that Mr. Paris was not executing all portions of a ticket at the same time. Specifically, I have concluded that he wrote the account number field and the commission field at a different time than he wrote the other fields on some of the Trade Tickets." LaPorte Report ¶ 52. Figures in LaPorte's report show the writing impressions he found. *See id.* at ¶¶ 25–30, Figs. 5–17. LaPorte also opined that his analysis of the impressions on the trading tickets led him to conclude that backdating occurred. *Id.* ¶ 52.

LaPorte summarizes his opinions as follows:

(a) Paris's assertion that the Trade Tickets have not been altered or backdated in anyway, based on their examination, is not scientifically supported. The 'naked-eye' process claimed to have been used by Paris to review the Trade Tickets is not scientifically valid;

(b) It is Highly Probable that the account numbers on some of the 'Buy' Trade Tickets purportedly executed by [Paris] were not written contemporaneously with the trade information in the top section of the Trade Tickets (Quantity, Security, Price Entered, and Price Filled);

(c) It is Probable that the account numbers on some of the 'Buy' Trade Tickets purportedly executed by [Paris] were written hours after the 'Buy' Trade Tickets were time stamped, and contemporaneous with when the 'Sell' Trade Tickets for the same security were completed.

LaPorte Report ¶ 24.

LaPorte explains that as used in the "forensic document community," the phrase "Highly Probable" denotes "evidence that is very persuasive, and the examiner is virtually certain, but

there is some limiting factor that precludes the examiner from reaching absolute certainty." *Id.* at 8 n.2. The term "Probable" means "strong evidence that is persuasive." *Id.* at 8 n.3.

### C. Elin Cherry

Elin Cherry earned her law degree from the University of Colorado and has worked in the securities compliance industry since 1996. *See* Cherry Report ¶¶ 1–3 & Ex. A, ECF No. 107-2 (curriculum vitae attached as exhibit A). She founded a compliance consulting firm in 2016. *Id.* Ex. A at 1. Before that, she most recently held the title Principal and Head of Capital Markets Practice with "Compliance Risk Concepts." *Id.* She has experience in "compliance programs, regulatory relations, testing and monitoring, compliance audits, and capital markets." *Id.*

Referring to BAM and BRAI collectively as "Barrington," Cherry summarizes her opinions as follows: "Barrington's compliance and supervisory program did not protect Barrington's clients. The program was riddled with deficiencies that created an opening for misconduct like cherry-picking. That was even more true for Barrington's Chief Compliance Officer [Paris], because his trading during the Relevant Period was unsupervised." Cherry Report ¶ 8. In her report, Cherry describes the role of a chief compliance officer as "responsible for ensuring that the broker-dealer adheres to industry best practices, thus protecting the reputation and stability of the firm, the industry as a whole, and the firm's customers." *Id.* ¶ 10.

Cherry explains that in the mid-1990's, the Financial Industry Regulatory Authority (FINRA) created an electronic system called Order Audit Trail System (OATS) to track and record orders of equity securities. *Id.* ¶ 18. Barrington had a fully automated system "for submitting OATS records to regulators," yet Barrington, in her opinion, "inexplicably" continued to prepare paper trading tickets "that contradicted the OATS data." *Id.* ¶ 19. Based on a comparison she apparently conducted of Barrington's OATS data to the paper trading tickets, Cherry opines that the tickets are "inaccurate." *See id.* ¶¶ 22–40. According to Cherry's analysis, Barrington's "deficient compliance and supervisory program created the opportunity to

11

cherry-pick." *Id.* ¶ 45–47. Cherry's report included the following chart summarizing how, in her opinion, Barrington's order processing deviated from industry norms and best practices:

| | MANUAL TRADING PRE-2000 | AUTOMATED TRADING POST-2000 (OATS AND BEYOND) | BARRINGTON'S TRADING DESK |
|---|---|---|---|
| **Step 1:** **Write** **Order** | Trader writes a paper order ticket and timestamps paper order ticket. | Trader enters order information into trading account in order management system (OMS); OMS timestamps the event. There is no paper order ticket, which has been replaced by the information from the OMS. | Trader writes order memorandum that does not meet all the requirements of the order ticket; often the order ticket is timestamped, sometimes it isn't. Trader then enters the order into the OMS, which timestamps the event. The information in the OMS and on the paper ticket are not always the same. The timestamps are not the same; there is commonly a lag of a few minutes to a few hours difference in the timestamps. BRAI did not produce "order tickets from the OMS" when Fidelity was the clearing firm. Instead, BRAI provided paper order tickets and at times has represented that the paper order tickets were the official record of the order. |
| **Step 2:** **Order** **Routing** | Trader calls other broker-dealers or exchange and gives them order; trader timestamps the order ticket. | OMS routes the order to other broker-dealers or exchanges based on trader's instructions or algorithm; OMS timestamps the event. | OMS routes the order to another broker-dealer based on the trader's instructions, and often timestamps the event. |
| **Step 3:** **Order** **Changes** | Any changes to the order (such as quantity or instructions) are documented on the order ticket, which is timestamped. | Trader enters changes to the order into the OMS, which automatically timestamps those events. | Changes to the order are often absent from the paper order ticket, but changes occurred in the OMS, which alerted OATS. |

| Step 4:<br><br>Order<br><br>Execution<br><br>and<br><br>Reporting | Exchange or other broker-dealer calls trader and furnishes the executed quantity and price. The trader timestamps the paper order ticket — OR — order remains unexecuted. | Exchange or other broker-dealer reports the executed quantity and price to the OMS; OMS timestamps the receipt of information— OR — order remains unexecuted. | The broker-dealer that executed the order reports the executions back to the OMS, which documents and timestamps each individual execution. Many orders have multiple executions.  The trader documents the full execution on the paper trade ticket with a timestamp.  This timestamp is often different from the OMS timestamps.  The other two traders time-stamped their order tickets 3 times — time received, time order sent out, and time order was executed.  Mr. Paris, however, seemed to only time-stamp his tickets twice, often within seconds of each other. |

Cherry opines on two additional subjects.  The first is the accuracy of Barrington's Form ADV.  Cherry wrote in her report that Barrington's "clear lack of care" in preventing Paris's alleged cherry-picking "significantly deviated" from the commitments and representations made in the Form ADV.  *Id.* ¶ 65. Second, Cherry catalogs several alleged errors and omissions from Barrington's compliance manual.  *See id.* ¶¶ 52–56.  She opines that the lack of attention to detail in the manual evinces defendants' "disregard for a basic compliance and supervisory program," and "there was no culture of compliance at Barrington."  *Id.*

## IV. Analysis

Section 10(b) "prohibits (1) using any manipulative or deceptive device in contravention of rules prescribed by the SEC (2) in connection with the purchase or sale of securities."  *SEC v. Bauer*, 723 F.3d 758, 768 (7th Cir. 2013) (citing *United States v. O'Hagan*, 521 U.S. 642 (1997)). Defendants do not dispute that cherry-picking, as alleged by the SEC, is a manipulative device within the meaning of § 10(b).  Indeed, that proposition has been common ground throughout this litigation, including on defendants' unsuccessful motion to dismiss the amended complaint.

*See SEC v. Paris*, 2022 WL 3026913, at *6–9 (N.D. Ill. Aug. 1, 2022).  Furthermore, no party disagrees that if the SEC establishes that Paris engaged in cherry-picking as the SEC alleges, the second element will be satisfied because he did so in connection with buying and selling securities.  *See SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 460–61 (5th Cir. 2022).

To prevail at trial, the SEC must "prove that a [cherry-picking] scheme existed."  *SEC v. Slocum, Gordon & Co.*, 334 F.Supp.2d 144, 176 (D.R.I. 2004); *see World Tree Fin.*, 43 F.4th at 461.  The SEC need only establish cherry-picking by a "preponderance of the evidence."  *Slocum, Gordon & Co.*, 334 F.Supp.2d at 146.  Defendants move for summary judgment on counts III and IV, arguing that neither claim can be sustained without underlying evidence that cherry-picking occurred.  *See* Defs.' Mem. Supp. Mot. Summ. J. 24–25.  The SEC does not contest this proposition.  The parties have briefed the summary judgment motion on the premise that the amended complaint's four counts rise and fall together insofar as they are based on the factual contention that Paris cherry-picked trades.

At summary judgment, the SEC relies on the reports and testimony of Regan and LaPorte to carry its burden to prove that cherry-picking occurred.  *See* Resp. to SAF ¶¶ 6–32.  Thus, defendants' motion for summary judgment boils down to the question of whether Regan and LaPorte's opinions and testimony are admissible.[2]

### A. Principles Governing Admissibility of Expert Opinion Testimony

Federal Rule of Evidence 702 provides:

---

[2] In paragraphs 33–38 of their response to the SEC's Local Rule 56.1(b)(3) statement of additional facts, defendants object that the declaration of Pesach Glaser, Pl. Ex. G., ECF 91-7, is an untimely and undisclosed expert report.  *See* Resp. to SAF ¶¶ 33–38 (running objection); Fed. R. Civ. P. 26(e).  Defendants do not develop this argument further in their briefing or in their response to the SEC's fact statement.  *See id.*  Failure to develop an argument that an expert did not timely disclose an opinion results in waiver of the argument.  *E.g.*, *Artis v. Santos*, 95 F.4th 518, 527 (7th Cir. 2024).  Indeed, the present record does not contain enough information for the court to analyze the timeliness of the SEC's expert disclosures, for it has no idea what was disclosed or when.  *See id.*  In any event, the court need not reach defendants' objections concerning the timeliness of SEC's expert disclosures because the court does not rely on paragraphs 33–38 of the SEC's statement of additional facts to resolve defendants' motion for summary judgment.  The court implies nothing about the admissibility of Glaser's declaration or testimony at trial.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The proponent of expert opinion testimony bears the burden to demonstrate that it is admissible under Rule 702. *Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024). As interpreted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Rule 702 requires "the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (quoting *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017)). To decide whether expert testimony is admissible, the court performs a three-step analysis: (1) determine whether the witness is qualified; (2) determine whether the expert's methodology is scientifically reliable; and (3) determine "whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* at 780 (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). Defendants do not argue that the SEC's witnesses are unqualified by knowledge, training, skill, or experience, and, based on their reports and resumes, the court agrees that they are qualified in their respective areas of expert. *See* e Regan Report ¶ 2 & App. A; LaPorte Report ¶¶ 1–15 & Attach. 1. Thus, the analysis here focuses on the final two steps, which effectively merge in this case.

The Seventh Circuit has identified a non-exhaustive list of factors to consider when evaluating the admissibility of expert testimony. *See id.* Those factors are:

(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; (4) whether the theory has been accepted in the relevant scientific community; (5) whether maintenance standards and controls

exist; (6) whether the testimony relates to matters growing naturally and directly out of research [the putative experts] have conducted independent of the litigation, or developed expressly for purposes of testifying; (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion (8) whether the expert has adequately accounted for obvious alternative explanations; (9) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting and (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Id.* at 779–80 (internal citations, quotations, and alterations omitted).

The court applies the foregoing factors "flexibly as the case requires." *Id.* at 780 (quoting *Krik*, 870 F.3d at 674; other citation omitted); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–51 (1999). However, this flexibility is not without limit. "The district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony. The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony." *Gopalratnam,* 877 F.3d at 780 (brackets, ellipses, and alterations omitted) (quoting *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013)).

In addition to the requirements for admissibility of Rule 702, "Rule 403 allows a court to exclude even relevant evidence, including expert testimony, 'if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Artis*, 95 F.4th at 525 (quoting Fed. R. Evid. 403). "The balancing test under Rule 403 is a sliding scale. The amount of prejudice that is acceptable varies according to the amount of probative value the evidence possesses." *United States v. Johnson*, 89 F.4th 997, 1009 (7th Cir. 2024) (internal quotations omitted). The Seventh Circuit has recognized that "while it is not unheard of to exclude evidence under Rule 403 at the summary judgment stage, normally the balancing process contemplated by that rule is best undertaken at the trial itself." *Adams v. Ameritech Servs, Inc.*, 231 F.3d 414, 428 (7th Cir. 2000) (citing *Weit v. Continental Ill. Bank & Trust Co.*, 641 F.2d 457, 467 (7th Cir. 1981)). The court bases its Rule 403 rulings in this opinion on the summary judgment and other evidence cited by the parties. Consistent with Seventh Circuit law, the Rule 403 rulings made at summary judgment may be revisited if a more fully developed

16

record at trial materially alters the Rule 403 calculus. *See, e.g., Rivera v. Guevara*, 2018 WL 11468923, at *8 (N.D. Ill. June 1, 2018).

**B. Regan's Opinions and Testimony**

*1. Statistical Analysis*

In moving to exclude Regan's expert opinions and testimony, defendants identify two sets of alleged flaws and faulty assumptions in his statistical analysis. *See generally* Mem. Supp. Mot. to Exclude Regan's Testimony, ECF No. 73. First, defendants point to undisputed summary judgment evidence showing that personnel other than Paris sometimes placed trades in the pertinent accounts. *See id.* at 9–15. Defendants maintain that Regan's "entire analysis [is] unreliable" because he assumes, contrary to the evidence, that Paris made nearly all the trades he analyzed. Reply Supp. Mot. to Exclude Regan's Testimony 1, ECF No. 97 (citing no authority). Defendants cite no case in support of their position. *See* Mem. Supp. Mot. to Exclude Regan's Testimony 9–16.

The problem with this argument is that an expert is not required to resolve disputed facts in defendants' favor. *See United States v. Hall*, 93 F.3d 1337, 1345–46 (7th Cir. 1996). Rather, "[i]t is enough if the expert makes clear what his opinion is, based on the different possible factual scenarios that might have taken place." *Id.* "The soundness of the factual underpinnings of the expert's analysis" is a "factual [matter] to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *see* Fed. R. Evid. 702. Regan excluded from his statistical analysis trades that BRAI employee Alexander Paris, Jr. identified as having been placed at his (not Gregory Paris's) direction. *See* Resp. to SAF ¶ 8. There is a genuine dispute over whether, and if so which, other BRAI personnel directed Paris to make one or more of the other trades at issue. *See id.* ¶¶ 45–46, 48–51. Because the underlying facts are genuinely disputed, Regan's assumptions about which trades Paris placed do not render his testimony inadmissible. Instead, a jury must resolve the underlying factual disputes. *See Smith*, 215 F.3d at 718.

Next, defendants contend that Regan's analysis is unreliable because he did not account for the different strategies Paris allegedly used when trading for himself and for clients. Thus, defendants maintain that Regan's analysis of First Day profits is so flawed as to render his opinions inadmissible. The SEC responds that defendants' arguments go to the weight and credibility of Regan's testimony, not its admissibility. As with defendants' prior argument, what strategy was employed for individual trades is genuinely disputed, so Regan may offer an opinion so long as he makes clear that he bases his opinion on an assumption about a disputed fact. *See, e.g.*, *Ryobi Techs.*, 725 F.3d at 766–67; *Angelopoulos v. Keystone Orthopedic Specialists, S.C.*, 2017 WL 2178504, at *10 (N.D. Ill. May 16, 2017).

Defendants rely on one case, *SEC v. Slocum, Gordon & Co.*, 334 F.Supp.2d 144 (D.R.I. 2004), as support for their argument that Regan's analysis is unreliable. Mem. Supp. Mot. to Exclude Regan's Testimony 22. The court in *Slocum, Gordon & Co* did not conduct a Rule 702 or *Daubert* analysis of expert testimony. Instead, the court issued its opinion after a bench trial and weighed competing evidence and testimony it heard concerning the reasons the defendant traders allocated the same stock to themselves and to a client on the same day. *Slocum, Gordon & Co,* 334 F.Supp.2d at 172–73. On balance, the court found "[m]ost persuasive" the traders' "testimony regarding specific transactions. In most cases, [they] were able to testify to specific events that triggered their firm purchases, and then explain why, after the events causing the sudden increase in price abated, they later considered the investment stable and appropriate for clients." *Id.* at 172. As this short discussion shows, *Slocum, Gordon & Co*. does not support excluding Regan's expert testimony. Rather, the case lends some support to admitting it because there appears to be no question that the court thought the SEC's statistical evidence of defendants' same-day purchases was probative (but not dispositive) of its cherry-picking allegations. *See id.*

In drawing the line between Rule 702 admissibility issues and factual questions properly for the jury, the Fifth Circuit's analysis of the SEC's statistical evidence in *World Tree Financial*, *supra*, provides helpful guidance. Similar to the case at bar, in *World Tree Financial,* the SEC

brought an enforcement action alleging that the two defendants, spouses Perkins and Gilmore, cherry-picked trades made in an omnibus account by allocating favorable trades to themselves after the trading day ended. *See* 43 F.4th at 456. After a four-day bench trial, the district court found in favor of the SEC. *Id.* at 457. Perkins and Gilmore testified at the trial, as did one expert for the SEC and one expert for the defendants. *See id.*

The SEC also presented statistical evidence through its expert witness showing that 90% of the time Perkins, like Paris, waited until after the trading day ended to send his trades to his broker. *See id.* The Fifth Circuit summarized the testimony of the SEC's expert, Cathy Niden, as follows:

> To analyze World Tree's allocation data, Niden divided the client accounts into three categories: (1) accounts controlled by Perkins, Gilmore, or both ("Favored-Perkins accounts"); (2) accounts owned by World Tree clients other than Matthew LeBlanc and his business Delcambre Cellular ("Favored-Client accounts"); and (3) accounts owned by LeBlanc and Delcambre ("Disfavored accounts"). She then measured several performance measures and subsets of trades: most and least profitable trades, day trades, average First Day returns, earnings-day trades, overlapping stocks, and trades after LeBlanc complained to Perkins about his accounts' poor performance. According to her analysis, from July 2012 to July 2015, Perkins methodically allocated trades with favorable First Day returns to the Favored-Perkins and Favored-Client accounts, while allocating trades with unfavorable First Day returns to the Disfavored accounts.
>
> Niden opined that the "evidence overwhelmingly indicates that Perkins engaged in cherry-picking." Though she acknowledged at trial that the data reflected only a pattern and that she did not "have the ability to identify individual trades that may or may not be improper," the data in the aggregate showed a "one in one million chance that these patterns could have occurred if allocations were being made without regard to First Day return." The district court found Niden credible and her testimony to be "thorough and compelling."

*World Tree Fin.*, 43 F.4th at 457–58.

The defendants' expert opined that Niden's analysis was flawed, and defendant Perkins testified that an innocent explanation existed for some of the trades. *See id.* at 458. After weighing the competing evidence, the district court sided with the SEC, and the Fifth Circuit affirmed its decision.

On appeal, the defendants argued that the SEC's statistical evidence was insufficient to prove cherry-picking. The Fifth Circuit held to the contrary, reasoning as follows:

Statistical evidence, like all evidence, "is a means to establish or defend against liability" and "[i]ts permissibility turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454–55 (2016). . . . Statistical evidence can be useful in securities cases, and its admission is no novelty.

\* \* \* \*

Because cherry-picking is "difficult to detect," determining whether it has occurred often requires drawing inferences from a pattern of behavior, irregularities, and trading data. Here, Niden opined that there was "less than a one in one million chance" that the patterns could have occurred if the allocations were made without regard to First Day return.

Of course, a statistical analysis is only as reliable as the assumptions beneath it. Perkins and World Tree challenge Niden's analyses on several grounds: she used "unrealized 'first day results,' which show only unrealized gains and losses"; she did not use a "comparator"; she disregarded differences between Favored and Disfavored accounts; she employed a result-driven approach; and she did not use all available information. . . . [T]he district court considered each expert's account and found that Theriot failed to rebut key points of Niden's analyses. The district court found that Niden's analyses showed Perkins "allocated an overwhelming proportion of positive trades to Favored-Perkins and Favored-Client accounts and an overwhelming proportion of negative trades to the Disfavored accounts." While Theriot's testimony "explain[ed] some of the disproportionate results," it "did not alter the Court's conclusion that the only plausible explanation for the disproportional losses in the Disfavored accounts and gains in the Favored accounts is cherry-picking." Importantly also, the court heard Perkins' explanations for the allocation patterns firsthand, yet found them "implausible or largely beside the point." It "did not believe him when he claimed that he did not engage in cherry-picking."

*Id.* at 462–63 (footnotes and some internal citations omitted).

Similarly here, defendants contend that Regan's statistical analysis of Paris's trading activity rests on invalid assumptions and makes a flawed comparison of Paris's First Day profits and losses, despite the disputed evidence that Paris's trading strategy for himself differed from his strategy when trading for clients. While the particulars of Paris and BAM's critiques of Regan's analysis differ slightly, the basic point made in *World Tree Financial* applies here: defendants' contentions concerning the reliability of Regan's statistical analysis do not render his opinions inadmissible. Instead, they raise questions that must be resolved by a factfinder at trial.

*See World Tree Fin.,* 43 F.4th at 462–63.[3]  These cases further bolster this court's conclusion that defendants' challenges to Regan's analysis and opinions raise weight and credibility questions for the fact finder to resolve.

Accordingly, Regan's opinions and testimony concerning his statistical analysis of trading data are admissible.  *See* Fed. R. Evid. 702.  Defendants' contentions that Regan makes faulty assumptions and flawed comparisons may of course be argued to a jury.  Under *World Tree Financial*, Regan's testimony, if believed by the jury, suffices to prove the SEC's cherry-picking claims by a preponderance of evidence.  Consequently, summary judgment must be denied regardless of whether LaPorte's and Cherry's opinions and testimony are admissible.

*2. Opinions on Personal Finances*

The court turns to Regan's opinions concerning Paris's personal finances between 2015 and 2019.  The SEC does not rely on this portion of Regan's opinions at summary judgment.  *See generally* Pl.'s SAF *passim*.

For an opinion to pass through the gates of Rule 702, the "expert [must] explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Cantrece*, 597 F.3d 824, 835 (7th Cir. 2010); other citation omitted).  An expert who provides "bottom line" testimony without an explanation of the methods underpinning it provides "nothing of value to the judicial process."  *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998) (quoting *Mid–State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir.  1989)).  Regan devotes just three paragraphs of his expert report to his analysis of Paris's personal finances.  *See* Regan Report ¶¶ 145–47.  The report recites that Regan reviewed Paris's tax returns and bank statements and that Regan concluded that Paris used withdrawals from his personal trading accounts to meet his expenses.  *See id.*  Regan does not explain how he

---

[3] Consistent with *World Tree Financial*, at least two other SEC enforcement actions alleging cherry-picking have been tried with the district court drawing competing inferences from expert testimony similar to Regan's.  *See Slocum, Gordon & Co.*, 334 F. Supp. 2d at 174–76; *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1295–96 (S.D. Fla. 2007), supplemented (Jan. 4, 2008).

reached those conclusions. *See id.* His report provides nothing in the way of an analysis that would allow the court, or a jury, to check or reproduce his results. *See id.* In other words, Regan provides a bottom line conclusion about Paris's personal finances without explaining how he applied his specialized knowledge, skill, training, or expertise. That does not suffice under Rule 702, and Regan's personal finance opinions are inadmissible for this reason alone. *See Metavante Corp.*, 619 F.3d at 761; *McMahon,* 150 F.3d at 658.

In addition, the record does not make clear why Regan's analysis of Paris's personal finances requires the application of specialized skill, knowledge, expertise, or training. "Expert testimony is permitted to assist the trier of fact with technical issues that laypeople would have difficulty resolving on their own. Expert testimony furthers this purpose only if the expert is in fact providing the jury with genuine expertise." *Ryobi Techs.*, *supra*, 725 F.3d at 765. Regan's report says nothing about the complexity of Paris's tax returns and bank statements. *See* Regan Report ¶¶ 145–47. As described in Regan's report, he calculated from bank records and tax returns that Paris's expenses exceeded his salary income between 2015–2019 and that Paris made up the difference by withdrawing from his trading account. *See id.* Why a jury needs an expert to perform such calculations has not been explained and is not obvious. On its face, the analysis Regan performed appears to be the stuff of ordinary household budgeting–a subject with which a juror is likely to be familiar. *Cf. Kumho Tire*, *supra*, 526 U.S. at 149 (noting that "the expert's testimony often will rest 'upon an experience confessedly foreign in kind to the jury's'" (quoting L. Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv. L.Rev. 40, 54 (1901); brackets omitted). Since the burden rests with the SEC to establish the admissibility of Regan's testimony, the fact that Regan's analysis on its face appears to involve application of principles with which the jury is likely familiar further cuts against admitting his opinions on Paris's personal finances.

### C. Laporte's Opinions and Testimony

Defendants argue broadly that LaPorte's opinions stemming from his forensic analysis of trading tickets "will not assist the jury" and instead will "create an extremely high risk of

confusing the jury and prejudicing Defendants." Mem. Supp. Mot. To Exclude LaPorte Testimony 1, ECF No. 71. Despite the danger of unfair prejudice, courts have admitted the opinions of document forensics experts who used ESDA to identify writing impressions on documents. *See, e.g.*, *Globaltech, Inc. v. Glob. Encasement, Inc.*, 2009 WL 3352751, at \*12–14 (E.D.N.Y. Mar. 12, 2009); *Armament Sys. & Procedures, Inc. v. IQ Hong Kong Ltd.*, 2007 WL 2154237, at \*2 (E.D. Wis. July 24, 2007). For purposes of the pending motions, "Defendants do not challenge the reliability of the methods that LaPorte used to recover impressions." Mem. Supp. Mot. To Exclude LaPorte Testimony at 13. They challenge the admissibility of LaPorte's opinions on two grounds.

Defendants first argue that LaPorte's analysis will not be helpful to the jury because his "opinions are limited to such a tiny fraction of the tickets." *Id.* at 12. Defendants point out that LaPorte examined 1,132 tickets but identified only ten Paris allegedly filled out in more than one sitting. *Id.* For these ten tickets, LaPorte declined to draw any inferences about the other tickets he examined because, as he testified at his deposition, doing so would not be scientifically supportable. *See* LaPorte Dep. 78:24–79:24, 156:24–157:8, ECF No. 107-12 at 1152, 1171. Defendants assert that "[a]n opinion limited to less than one percent of the tickets that Paris completed will not help the jury to understand the evidence or determine a fact in issue." Mem. Supp. Mot. To Exclude LaPorte Testimony at 12. This evidence is clearly relevant to the SEC's theory. As long as LaPorte testifies to the limitations of his findings, it is difficult to see why this evidence should be excluded. Defendants argue that they will be prejudiced because the jury is likely to extrapolate anyway, but they offer no reason or authority supporting their position that a jury would not understand this aspect of LaPorte's testimony or the limitations on his analysis. *See* Mem. Supp. Mot. To Exclude LaPorte Testimony 11–13. To the extent a danger of unfair prejudice may exist, defendants remain free to apply for a limiting instruction at trial.

Defendants also argue that LaPorte's opinions are methodologically flawed because he did not adequately rule out alternative explanations for the presence of writing impressions on the trading tickets he analyzed. *See* Mem. Supp. Mot. Exclude LaPorte Testimony at 13–15.

Defendants rely primarily for this argument on their cross-examination of LaPorte at his deposition. Viewed in a light favorable to defendants, LaPorte testified at his deposition that it is "possible all his findings could be explained by other causes –such as a blank ticket with existing impressions being subsequently filled out, the ticket being moved as it was being filled out, or impressions becoming obscured due to normal handling of the tickets." *Id.* at 14. As defendants argue, LaPorte acknowledged that he could not, and did not, draw any statistical conclusions about the tickets on which he found no impressions. *See* LaPorte Dep. 46:1–47:13, 95:2–15, 96:9–21, 154:11–155:1. Defendants cite no case and no scientific or other evidence showing that LaPorte's failure to rule out other possible causes renders his opinion methodologically flawed. *See* Mem. Supp. Mot. Exclude LaPorte Testimony at 13–15. Nor do they point to any scientific or other forensic document examination resource indicating how an expert like LaPorte should go about ruling out other explanations or that it is possible to do so. *See id.*

Although defendants frame this argument as a methodological challenge, in substance they take issue with the conclusions LaPorte ultimately drew from his analysis of the impressions he found. "Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions those methods produce— that is, whether the conclusions are unimpeachable . . . . An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt." *Ryobi Techs.*, *supra*, 725 F.3d at 765–66 (internal citation omitted). Thus, courts confronted with similar document forensic expert testimony have not excluded it as methodologically flawed. Rather, the factfinder at trial typically chooses among alternative reasonable explanations for the presence of impressions on written documents and is free to weigh and accept all, some, or none of the expert's conclusions. *See GlobalTech,* 2009 WL 3352751, at *15–21 (weighing competing inferences from expert's ESDA analysis following a bench trial); *Armament Sys.*, 2007 WL 2154237, at *2–11 (same). As they did at his deposition, defendants may cross examine LaPorte at trial about alternative explanations, and the jury—not this court—will decide how much, if

24

any, of LaPorte's conclusions to accept.  *See Daubert*, *supra,* 509 U.S. at 595.  Since LaPorte's opinions and testimony are admissible at summary judgment, they further support the denial of defendants' summary judgment motion.

### D Cherry's Opinions and Testimony

Because Paris served as BAM and BRAI's compliance officer, The SEC intends to use Cherry's testimony to show that he "oversaw a deficient compliance program."  Resp. to Mot. to Exclude Cherry Testimony 2, ECF No. 81.  The SEC plans to call Cherry to provide expert testimony on "the norms and appropriate standard of care for securities industry compliance programs."  *Id.*  As with all expert testimony explicating the standard of care, admitting expert testimony describing compliance norms and practices in the securities industry runs the risk that the jury may improperly equate the industry's prevailing norms and practices with the legally required standard of care.  *See, e.g., Peoples State Bank v. Stifel, Nicolaus & Co., Inc.*, 2013 WL 1024917, at *7 (S.D. Ind. Mar. 14, 2013).  Even so, as the SEC observes, courts sometimes permit experts to testify about the norms and standards in the securities industry to assist the jury in understanding the evidence in an enforcement action.  *See, e.g.*, *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 812 (11th Cir. 2015).  Here, defendants do not dispute that the norms and standards for compliance programs in the securities industry lie outside the ordinary experience of the jury.  They maintain, however, that Cherry's expert testimony and opinions are unreliable in the following respects.

At the outset, the court agrees with defendants' argument that Cherry's opinion that the written trading tickets BRAI and BAM produced are "inaccurate" and "unreliable" lacks an adequate foundation in the record for admission under Rule 702.  "Rule 702 'establishes a standard of evidentiary reliability,' 'requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility,' and mandates that the testimony have 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"  *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)).  Nowhere in her report does Cherry list the documents she reviewed or the basis of her

opinions on the tickets' accuracy. *See* Cherry Report ¶¶ 21-40. She appears to have compared an unspecified number of trading tickets with OATS data, and her report says that the timestamps and handwritten information on "some" tickets do not match the OATS data. *See id*. ¶¶ 38-40. Which tickets? What specific OATS data did not match? Cherry does not say in her report. *See id.* When asked at her deposition, she could not specify which tickets she reviewed or the criteria she used to reach her conclusions. *See* Cherry Dep. 125:10-126:5, 128:21-129:10, 137:11-138:2.

The SEC responds that Cherry's accuracy opinions are based on undisputed facts, citing the declaration of an SEC accountant, Pesach Glaser ("Glaser"), who provided an analysis of the trading tickets. *See* Resp. to Mot. to Exclude Cherry Testimony 8-9, ECF 81 (citing Glaser Decl., Pl. Ex. G, ECF No. 97-1). But the SEC cites nothing in Cherry's report or deposition testimony indicating that she relied on Glaser's declaration, or his analysis, rather than conducting her own analysis of the tickets as she testified at her deposition. *See id.* And whether the tickets accurately reflect what occurred is hotly and genuinely disputed. The SEC has not carried its burden to show that Cherry's opinions on that subject are based on sufficient facts and data or that they are the products of the application of reliable principles and methods. *See* Fed. R. Evid. 702. Indeed, the court cannot determine what methodology Cherry employed or what standards she used to decide whether a given trading ticket was accurate. *See* Cherry Report ¶¶ 21–39. The court therefore excludes Cherry's testimony and opinions to the extent she opines, based on her review of the tickets and OATS data, that the trading tickets are inaccurate. *See, e.g.*, *Burns v. Sherwin Williams*, 78 F.4th 364, 374 (7th Cir. 2023).

However, as explained *supra*, an expert may base her opinions on the hypothesized resolution of disputed facts, leaving the resolution of the underlying factual dispute to the jury. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *United States v. Hall*, 93 F.3d 1337, 1345–46 (7th Cir. 1996). Cherry's other opinions rest in part upon the premise that the trading tickets are inaccurate. For instance, she bases her analysis of the adequacy of Barrington's compliance and supervisory programs, specifically Barrington's use of paper trading tickets rather than an electronic order processing system, on the premise that the tickets

26

are inaccurate and unreliable. *See* Cherry Report ¶¶ 45–47. Although she cannot offer an opinion based on her own analysis of the tickets' inaccuracy, assuming an adequate factual foundation is laid, Cherry may testify based on the assumption that the tickets are inaccurate and offer her opinion on what that means about Barrington's compliance and supervisory program, provided that she makes clear that she is making an assumption about a factual dispute that the jury must resolve. *See Smith*, 215 F.3d at 718.

The court turns now to defendants' challenges to the admissibility of Cherry's other opinions. Several of defendants' arguments improperly invite the court to reject Cherry's conclusions under Rule 702. For example, defendants point to their cross-examination of Cherry at her deposition concerning her opinion that purported errors she found in BRAI's compliance manual demonstrate that a lax culture of compliance existed, thereby creating fertile ground for misconduct. *See* Cherry Report ¶ 51–52. Defendants' attorney cross-examined Cherry extensively about passages in the manual defendants contend satisfy her concerns. *See, e.g.*, Cherry Dep. 12-13, 178:18-21; 182; 256:19-257:1; 250:4-18; 257:2-5; 251:4-24; 252:11-255:11-14; 255:15-256-7; 256: 8-18; 263:19-264:4, 266:18-268:5. Nothing in this testimony rises to the level of outright refuting Cherry's opinions however. Defendants point to no methodological flaw or industry principle that Cherry purportedly misapplied. *See* Mem. Supp. Mot. to Exclude Cherry Testimony 12–17. Rather, the exchanges between defense counsel and Cherry reflect a genuine disagreement over whether the manual's references to and treatment of various compliance topics such as FINRA rules are adequate under prevailing norms and standards in the securities industry.

"Rule 702's reliability elements require the district judge to determine only that the expert is providing testimony that is based on a correct application of a reliable methodology and that the expert considered sufficient data to employ the methodology . . . . The judge should permit the jury to weigh the strength of the expert's conclusions . . . ." *Ryobi Techs.*, *supra*, 725 F.3d at 766 (citing *Metavante Corp.,* 619 F.3d at 762 (7th Cir. 2010)). Having reviewed Cherry's report and the deposition cross-examination cited by the parties, the court concludes that

27

defendants' criticisms and disagreements with her conclusions about Barrington's policy manual raise questions of the "correctness of [the] expert's conclusions [which] are questions for [the] jury."[4]  *Id.* (citing *Smith*, 215 F.3d at 718); *see also Manpower, Inc.*, 732 F.3d at 806–08.

Lastly, defendants seek to exclude Cherry's opinions that BAM's Form ADV contained material misrepresentations on several grounds.  *See* Mem. Sup. Mot. to Exclude Cherry Testimony 19–21.  They lead with the argument that a jury does not need specialized assistance to determine whether any statements in, or omissions from, the Form ADV are material and that this is an ultimate issue for the jury to decide.  *See id.* at 19.  The SEC responds that the "ultimate issue" is whether cherry-picking occurred, but the material misrepresentation claims in counts III and IV of the amended complaint also place misrepresentation front and center in this litigation.

In any event, the debate over what is the ultimate issue misses the point.  An expert's "opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a); *but see id.* R. 704(b) (exception for criminal cases).  Defendants cite two district court cases in which the SEC successfully moved to exclude the testimony of a defense expert who opined on the materiality of alleged omissions from a Form ADV.  *See SEC v. CapWealth Advisors, LLC*, 2022 WL 4225846, at *5 (M.D. Tenn. Aug. 3, 2022), *reconsideration denied,* 3:20-CV-1064, 2022 WL 11270344 (M.D. Tenn. Oct. 19, 2022); *SEC v. Ambassadors Advisors, LLC*, 2021 WL 6052589, at *14 (E.D. Pa. Dec. 21, 2021).  Both courts reasoned that the experts' opinions would not assist the jury because they were opining on "the very issue reserved for the jury to decide."  *CapWealth*, 2022 WL 4225846, at *5 (citing *Ambassadors Advisors, LLC*, 2021 WL 6052589).  The courts in both cases reasoned that given the centrality of the materiality issue, an expert's opinion on whether the defendants' Form ADV's were compliant would be of

---

[4] Defendants also briefly argue that Cherry's opinions impermissibly dwell on defendants' state of mind, citing portions of her report in which she opines that that it "seems as if there was no culture of compliance at Barrington," referring to Barrington's "clear lack of care."  Mem. Supp. Mot. to Exclude Cherry Testimony 14, ECF No. 69 (citing Cherry Report ¶ 65).  On their face, the statements defendants quote concern the standard of care and the culture at Barrington rather than the parties' state of mind. Any concerns about potential prejudice from the jury drawing inappropriate inferences about defendants' state of mind should be able to be mitigated with an appropriate limiting instruction at trial.

relatively little assistance to the jury when compared with its potential to usurp the jury's function.

This court has no quarrel with that general principle. The SEC cites no authority in response. *See* Resp. to Mot. to Exclude Cherry Testimony 13–14. And it offers no argument for distinguishing this case on its facts. *See id.* Cherry explains in her report that she believes Paris had an inherent conflict of interest as compliance officer. *See* Cherry Report ¶¶ 132–35. The court has been given no reason to believe that a jury will not be able to understand the parties' arguments about Paris's alleged conflict of interest without expert assistance. Accordingly, Cherry's opinions on the materiality of any alleged omissions from BRAI's Form ADV, *id.*, are excluded.

To sum up, the court grants defendants' motion to exclude Cherry's opinions about the accuracy of the trading tickets based on her analysis of the tickets and OATS data. However, assuming an adequate factual foundation is laid through other witnesses, Cherry may assume the resolution of disputed facts, including the disputed question of whether the trading tickets are accurate. Defendants' motion to exclude Cherry's opinions about the adequacy of defendants' compliance programs is denied. Defendants' motion to exclude Cherry's opinions on the materiality of alleged omissions from, and false statements in, BRAI's Form ADV is granted.

## V. Conclusion

For the reasons stated, defendants' motion for summary judgment is denied. Defendants' motion to exclude the expert opinions of Gerald D. LaPorte is denied. Defendants' Motions to exclude the expert opinions of Gregory J. Regan and Elin Cherry are granted in part and denied in part. Consistent with the foregoing analysis, the court rules as follows:

1. Gregory J. Regan's expert opinions on defendant Gregory D. Paris's personal finances, *see* Regan Report ¶¶ 145–47, are inadmissible under Federal Rule of Evidence 702; and

2.  Elin Cherry's opinions on the accuracy of defendants' trading tickets, as defined more fully herein, and her opinions concerning defendant Barrington Asset Management, Inc.'s Form ADV, are inadmissible under Rule 702.

Dated October 7, 2024                                    /s/ Joan B. Gottschall
                                                        United States District Judge